OHIO CONSUMERS' COUNSEL, APPELLANT, *v.* PUBLIC
UTILITIES COMMISSION OF OHIO, APPELLEE.

CITY OF MAUMEE ET AL., APPELLANTS, *v.* PUBLIC
UTILITIES COMMISSION OF OHIO, APPELLEE.

OHIO CONSUMERS' COUNSEL, APPELLANT, *v.* PUBLIC
UTILITIES COMMISSION OF OHIO, APPELLEE.

[Cite as *Ohio Consumers' Counsel v. Pub. Util. Comm.,*
109 Ohio St.3d 328, 2006-Ohio-2110.]

(Nos. 2004–1993, 2005–0118, and 2005–0766—Submitted
September 28, 2005—Decided May 3, 2006.)

O'DONNELL, J.

{¶ 1} Three separate appeals as of right have been consolidated for our review arising from an order of the Public Utilities Commission of Ohio ("PUCO").[1] The Ohio Consumers' Counsel ("OCC") and the cities of Maumee, Northwood, Oregon, Perrysburg, Sylvania, and Toledo, the village of Holland, and the Board of County Commissioners of Lucas County (collectively, the "governmental aggregators"[2]) appeal the PUCO order approving, inter alia, FirstEnergy Corporation's application for its proposed rate-stabilization plan. FirstEnergy, the Ohio Energy Group, and the Industrial Energy Users–Ohio have intervened in this appeal.

### Factual and Procedural Background

{¶ 2} The history of this case dates to enactment by the General Assembly of Am.Sub.S.B. No. 3, 148 Ohio Laws, Part IV, 7962 ("SB 3"), effective October 5, 1999, which provided for restructuring of Ohio's electric-utility industry with a goal of achieving retail competition with respect to the generation component of electric service. SB 3 provided for a transition period, termed the "market development period," during which an electric utility's rates would be subject to certain regulatory requirements. FirstEnergy's market-development period ended December 31, 2005.

{¶ 3} In response to SB 3, FirstEnergy filed an initial application on July 1, 2003, seeking approval of a proposed revision to its 2004 and 2005 shopping credits[3] established in the electric-transition plans earlier approved by the PUCO for each of FirstEnergy's operating companies. In an entry dated September 23, 2003,[4] the PUCO (1) denied FirstEnergy's proposed shopping-credit revision for 2004, (2) stated that the matter of the shopping credits for 2005 would best be considered "in the context of what would best promote orderly and progressive market development in the post market development period," (3) encouraged

---

1. The PUCO case appealed from is *In re Applications of Ohio Edison Co., the Cleveland Elec. Illuminating Co. & the Toledo Edison Co. for Authority to Continue & Modify Certain Regulatory Accounting Practices & Procedures, for Tariff Approval & to Establish Rates & Other Charges Including Regulatory Transition Charges Following the Market Dev. Period*, case No. 03–2144–EL–ATA (June 9, 2004) ("June 9, 2004 PUCO Opinion").

2. R.C. 4928.01(A)(13) provides: " 'Governmental aggregator' means a legislative authority of a municipal corporation, a board of township trustees, or a board of county commissioners acting as an aggregator for the provision of a competitive retail electric service under authority conferred under section 4928.20 of the Revised Code."

3. A shopping credit is an incentive to customers to obtain competitive retail electric (generation) service from a provider other than the incumbent electric distribution utility, in this case, FirstEnergy. It is a credit against, or a deduction from, the electric distribution utility's bill for electric service.

4. *In re Application of FirstEnergy Corp. on Behalf of Ohio Edison Co., the Cleveland Elec., Illuminating Co., & the Toledo Edison Co., for Approval of Tariff Adjustments*, case No. 03–1461–EL–UNC, 2003 WL 22535390 (Sept. 23, 2003).

FirstEnergy "to consider and develop plans for 2005 and beyond, which balance three objectives: rate certainty, financial stability for the electric distribution utilities and further competitive market development," and (4) directed FirstEnergy to file those plans before December 31, 2003.

{¶ 4} Responding to this directive, on October 31, 2003, FirstEnergy, on behalf of its Ohio operating companies, Ohio Edison Company, the Cleveland Electric Illuminating Company, and the Toledo Edison Company, filed another application, which marks the beginning of the proceedings at issue in this appeal. In its application, FirstEnergy sought PUCO approval of, inter alia, a proposed rate-stabilization plan to take effect at the end of the market-development period, December 31, 2005.

{¶ 5} Several groups and other entities intervened and participated in the PUCO proceedings that addressed FirstEnergy's application, including the OCC and the Northwest Ohio Aggregation Coalition on behalf of the governmental aggregators.[5] In connection with the FirstEnergy application, which had been filed on October 31, 2003, the PUCO conducted local public hearings in Toledo, Cleveland, and Kent in November 2003 and evidentiary hearings in February 2004. Members of the public submitted written testimony, comments, and letters for consideration by the PUCO. FirstEnergy, the Ohio Energy Group, the Ohio Hospital Association, Ohio Partners for Affordable Energy, Cargill, Inc., and the Industrial Energy Users–Ohio signed a partial stipulation and recommendation purporting to resolve some issues in this case and submitted it to the PUCO in February 2004. The parties filed posthearing and rebuttal briefs in March 2004, and the PUCO heard oral argument in April 2004.

{¶ 6} These proceedings culminated in the PUCO's June 9, 2004 opinion and order in this case, which, inter alia, approved a modified version of FirstEnergy's proposed rate-stabilization plan and determined that the price under the plan should be compared periodically with the prices submitted in a competitive-bid process.[6]

---

5. The other parties who intervened are Dominion Retail, Inc.; Green Mountain Energy Company; MidAmerican Energy Company, Strategic Energy LLC, and Constellation NewEnergy, Inc. (Ohio Marketers Group); WPS Energy Services; city of Cleveland; the Neighborhood Environmental Coalition, the Empowerment Center of Greater Cleveland, Consumers for Fair Utility Rates, and Citizen Power, Inc.; Ohio Partners for Affordable Energy; Cargill, Inc.; Reliant Resources, Inc.; Industrial Energy Users–Ohio; Constellation Power Source, Inc.; Ohio Manufacturers' Association; the Northeast Ohio Public Energy Council; Ohio Energy Group; the Kroger Company; Local 270 Utility Workers; PSEG Energy Resources and Trade; Midwest Independent Power Suppliers; National Energy Marketers Association; Calpine Corporation; Ohio Hospital Association; and Vallourec & Mannesmann Tubes Corporation.

6. In an opinion dated June 9, the PUCO determined that a competitive-bid process should be conducted "to assure the Commission and all interested stakeholders that the charges for

{¶ 7} As part of its opinion and order approving the rate-stabilization plan, the PUCO approved the following components, inter alia: (1) a rate-stabilization charge, which the PUCO stated compensates FirstEnergy for its commitment to provide "provider of last resort" [7] generation service for 2006–2008 for customers in its service areas who drop out of aggregation plans or short-term contracts with competing power-generation providers; (2) shopping credits, which a shopping customer receives when he or she uses a competitive retail-electric service provider; (3) interest on shopping-credit deferrals, which the OCC and the governmental aggregators argue violates a previous stipulation by the parties; and (4) a waiver of the requirement that it divest its generation assets in order to comply with R.C. 4928.17(A) because the PUCO determined that good cause existed to extend the financial-separation waiver with regard to the divestment of FirstEnergy's generating assets.

{¶ 8} Following the PUCO's June 9, 2004 opinion and order, various parties or intervenors [8] filed successive applications for rehearing, and in the three entries, the PUCO refined its concept of FirstEnergy's competitive-bid process. OCC objected to FirstEnergy's commission-approved rate-stabilization plan and, following the PUCO's third entry on rehearing, dated November 23, 2004, brought the appeal in case No. 2004–1993. The governmental aggregators appealed from the same opinion and order in case No. 2005–0118.[9]

Propositions of Law

{¶ 9} The OCC and the aggregators each assert five propositions of law,[10]

---

generation service under the [rate-stabilization plan] do not exceed long-term market prices that result from a [competitive-bid process]." Indeed, a competitive-bid auction was held on December 8, 2004; the results were reported to, and analyzed by, the PUCO; and the competitive-bid price was rejected by the PUCO because it was higher than the rate-stabilization plan price. See *In re Application of Ohio Edison Co., the Cleveland Elec. Illuminating Co. & the Toledo Edison Co. for Approval of a Competitive Bid Process to Bid Out Their Retail Elec. Load,* case No. 04–1371–EL–ATA, 2004 WL 3051098 (Dec. 9, 2004) (which details the method employed and conduct of the competitive-bid process auction and indicates that the PUCO "will consider another auction next year for the remaining two years of the [rate-stabilization plan]").

7. "Provider of last resort" means a provider to which a customer who shops for electric-generation service can return.

8. FirstEnergy and the Industrial Energy Users–Ohio filed first applications for rehearing. First-Energy, the OCC, the Industrial Energy Users–Ohio, the Neighborhood Environmental Coalition, the Empowerment Center of Greater Cleveland, the Consumers for Fair Utility Rates, the Northwest Ohio Aggregation Coalition, WPS Energy Services, and the city of Cleveland filed second applications for rehearing. FirstEnergy filed the third application for rehearing.

9. The court consolidated the three appeals, case Nos. 2004–1993, 2005–0118, and 2005–0766, because the same issues are presented in the appeals.

10. The OCC's and the governmental aggregators' propositions of law are set forth in the appendix.

which may be considered as the following issues: (1) approval of the rate-stabilization plan, (2) approval of the rate-stabilization charge, (3) approval of shopping credits, (4) grant of interest on shopping credits, and (5) approval of FirstEnergy's financial-separation plan. We affirm the PUCO with respect to propositions two, three, four, and five. Regarding the first proposition, however, the rate-stabilization plan as adopted by the PUCO failed to conform to R.C. 4928.14(B) because it did not ensure that a reasonable means for customer participation had been developed. We therefore remand the matter to the PUCO for further consideration of this aspect of its decision.

## Approval of Rate–Stabilization Plan

{¶ 10} The OCC and the governmental aggregators argue that, in accordance with R.C. 4928.14(A), as of January 1, 2006, electric-distribution utilities are required to provide customers with both a market-based standard service offer and, pursuant to R.C. 4928.14(B), an *option* to purchase electric service at a price to be determined through a competitive-bidding process. They further maintain that the PUCO lacks authority to approve a rate-stabilization plan that does not comport with these legislative mandates. It is the OCC's and governmental aggregators' position that, in this case, instead of requiring FirstEnergy to offer a market-based standard service *and* an option to purchase electric service at a rate set by way of a competitive-bidding process, the PUCO itself rejected all bids received in the auction and instead chose the rate-stabilization plan as the only offer to be presented to customers.

{¶ 11} Further, the OCC and the governmental aggregators contend that not only are customers being denied an option to purchase electric service at a price determined through a competitive-bidding process as required by R.C. 4928.14(B), but also, they are not being offered a market-based rate as required by R.C. 4928.14(A), because the rate-stabilization plan provides only rates at which FirstEnergy is willing to sell generation based on its own costs. The governmental aggregators argue that the rate-stabilization plan violates the PUCO's own rules, which provide that a market-based standard service offer must be at a rate that fluctuates with changes in wholesale market prices.

{¶ 12} In response, the PUCO and FirstEnergy contend that R.C. 4928.14(B) allows the PUCO to dispense with competitive bidding when there are other means to accomplish the same end and customers can reasonably participate. However, to fulfill its duty to the public, the PUCO first required FirstEnergy to engage in a competitive-bidding process, but then, the PUCO itself rejected the bids received because FirstEnergy had submitted the lowest bid. Accordingly, the PUCO argues, FirstEnergy offered the rate-stabilization plan as the best package the market could offer, and for this reason, the PUCO approved it. The OCC and the governmental aggregators respond that the rate determined

through the competitive-bidding auction held December 8, 2004, although higher than the proposed rate in the rate-stabilization plan, was fixed for a three-year period, whereas FirstEnergy could seek an increase in its rate during the same period. They argue that some customers would choose a stable fixed rate over the rate established in the rate-stabilization plan, which is subject to change.

{¶ 13} The PUCO and FirstEnergy further argue that the rate-stabilization plan meets the standard of a market-based standard service offer as determined by the PUCO and is sufficient to take the place of a competitive-bidding process because the PUCO tested it in a competitive-bidding situation. In addition, the PUCO agreed to conduct additional competitive-bid procedures to ensure that the price remains favorable throughout the life of the plan and that the PUCO could terminate the rate-stabilization plan if a more competitive bid surfaced in the future.

{¶ 14} The issue for our determination here, however, concerns whether the rate-stabilization plan conforms to the statutory requirements as set forth by the General Assembly in R.C. 4928.14.

{¶ 15} R.C. 4928.14(A) provides: "After its market development period, an electric distribution utility in this state shall provide customers, on a comparable and nondiscriminatory basis within its certified territory, a market-based standard service offer of all competitive retail electric services necessary to maintain essential electric services to consumers, including a firm supply of electric generation service."

{¶ 16} R.C. 4928.14(B) provides: "After that market development period, each electric distribution utility also shall offer customers within its certified territory an option to purchase competitive retail electric service the price of which is determined through a competitive bidding process." Significantly, the last sentence of R.C. 4928.14(B) provides, "The commission may determine at any time that a competitive bidding process is not required, *if other means to accomplish generally the same option for customers is readily available in the market and a reasonable means for customer participation is developed.*" (Emphasis added.)

{¶ 17} We recently decided *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, a case in which the parties stipulated to and the PUCO approved a pricing plan for the Dayton Power & Light Company without a competitive-bidding process. There, Constellation NewEnergy argued that the PUCO violated R.C. 4928.14(B) by adopting an alternative to the statutorily mandated competitive bid. Id. at ¶ 44. In that case, we stated that "[t]he commission's finding that the stipulation, as a package, benefits ratepayers and the public was fully supported by the record and was reasonable and lawful." Id. at ¶ 49. The stipulation at issue in *Constellation*

contained the agreement of, among others, the staff of the PUCO, Dayton Power & Light, and the Industrial Energy Users–Ohio, id. at ¶ 4, and provided for (1) ongoing PUCO review of market-based rates, through a competitive-bidding process, if necessary, (2) termination by the PUCO if market-based rates did not reasonably reflect the rates established by the stipulation, and (3) the establishment of a voluntary-enrollment procedure that provided customers an option to select a marketer and a reasonable method to participate. Id. at ¶ 48. We determined that the PUCO offered a convincing explanation of how the stipulation satisfied the alternatives to the competitive-bidding requirement of R.C. 4928.14(B). Id. at ¶ 47.

{¶ 18} Here, FirstEnergy filed a rate-stabilization plan including a market-based standard service offer, and the PUCO approved it, noting that it accomplished the same goals as a competitive bid and that customers could reasonably participate in it. However, unlike the record in *Constellation*, the record here contains nothing to persuade us that a reasonable means for customer participation has been developed as required by R.C. 4928.14(B). The absence of a stipulation signed by customer groups factually distinguishes this case from *Constellation*. In *Constellation*, we also noted that "no entire customer class was excluded" from settlement negotiations and that the following classes were represented and signed the stipulation: residential customers, low-income customers, commercial customers, industrial customers, and competitive retail electric service providers. Id. at ¶ 22–23. When it enacted R.C. 4928.14, the General Assembly anticipated that at the end of the market-development period, customers would be offered both a market-based standard service as required by R.C. 4928.14(A) *and* service at a price determined through a competitive-bidding process as required by R.C. 4928.14(B); one very narrow exception contained in R.C. 4928.14(B) permits the commission to determine that a competitive-bidding process is not required. In *Constellation*, the customer groups, by stipulation, agreed to accept a market-based standard service offer and waive any right to a price determined by competitive bid. Those facts are not present in this case. Rather, the PUCO itself made a unilateral decision to eliminate the offer to customers of a price determined through competitive bids as required by R.C. 4928.14(B). As FirstEnergy and the PUCO point out, R.C. 4928.14(B) states that the PUCO may dispense with a competitive-bidding process "if other means to accomplish generally the same option for customers is readily available in the market and a reasonable means for customer participation is developed." They assert that the market is not yet fully developed to the point at which meaningful competitive bidding can take place and that the rate-stabilization plan accomplishes the same objectives. The rate-stabilization plan, however, does not allow for customer participation, which is mandated by statute and which the PUCO is not authorized to ignore.

{¶ 19} In contrast to the customer groups in *Constellation,* the customer groups here did not agree to the FirstEnergy rates, and most customer groups, including the OCC, which represents all residential customers, opposed them.[11] Under these circumstances, the PUCO had no authority to adopt the rate-stabilization plan without also ensuring that a reasonable means for customer participation had been developed. While the PUCO has authority to dispense with a competitive-bidding process pursuant to R.C. 4928.14(B), if it does so, it must also ensure that "other means to accomplish generally the same option for customers is readily available in the market *and [that] reasonable means for customer participation is developed."* (Emphasis added.) R.C. 4928.14(B). Thus, in this case, the PUCO exceeded its statutory authority by approving a rate-stabilization plan that did not meet these requirements.

Rate–Stabilization Charge

{¶ 20} FirstEnergy includes a proposed rate-stabilization charge within its plan that the OCC maintains is a disguised generation-transition charge that may no longer be collected after December 31, 2005, pursuant to R.C. 4928.40. However, the evidence before the PUCO showed that, rather than a historically based charge to recover so-called stranded costs, the rate-stabilization charge was market-based and designed to serve a different function. June 9, 2004 PUCO Opinion at 47, 50 (finding No. 11). The rate-stabilization charge is intended to compensate FirstEnergy for the cost of its commitment to supply generation service as the provider of last resort for 2006 through 2008. Id. at 22–23, 47. The PUCO found that the charge fairly and reasonably compensates FirstEnergy for its risks. As required by R.C. 4903.09, the PUCO's reasoning and the factual basis supporting approval of the rate-stabilization charge are easily discernible from its order. See, generally, *MCI Telecommunications Corp. v. Pub. Util. Comm.* (1987), 32 Ohio St.3d 306, 311–312, 513 N.E.2d 337. The PUCO considered objections to the proposed charge and determined that it was not cost-based as the OCC and the government aggregators suggest. June 9, 2004 PUCO Opinion at 23. It did, however, approve the amount only after modification of the rate-stabilization plan. Id. at 24. Accordingly, approval of the rate-stabilization charge is within the authority of the PUCO.

---

11. The only supporters of the rate-stabilization plan that signed the stipulation in this case other than the FirstEnergy operating companies are the Ohio Hospital Association, Cargill, Inc., Industrial Energy Users—Ohio, the Ohio Energy Group, and the Ohio Partners for Affordable Energy. The first four parties represent large industrial customers, and Ohio Partners for Affordable Energy operates a weatherization program. The OCC, which represents residential customers, did not participate in negotiations or sign the stipulation in this case. The governmental aggregators likewise were not represented.

Shopping Credits

{¶ 21} As part of its proposed rate-stabilization plan, FirstEnergy proposed shopping credits for 2006 through 2008, to which the OCC and governmental aggregators object. "Shopping credits are a deduction against [FirstEnergy's] own generation charges on the bills of customers who switch to a competitive supplier for their generation services." June 9, 2004 PUCO Opinion at 28. Customers may also avoid paying a portion of the rate-stabilization charge if they commit to obtaining electric generation from another supplier. The credits are designed to encourage customer shopping for energy generation supplied by a competitive retail electric service. Id. at 28–34.

{¶ 22} Many residential consumers who shop obtain a shopping credit equal to FirstEnergy's generation rate. For other customers, the shopping credit is "enhanced." If customers take service under a qualifying aggregation program, or if commercial or industrial customers meet certain qualifications, their credit includes, in addition to the proposed generation rate, a percentage of the rate-stabilization charge. June 9, 2004 PUCO Opinion at 30–33. Different levels of shopping credits are granted depending on the length of the customer's contract with FirstEnergy's competitor. Specifically, residential customers whose aggregator obtains a three-year commitment by a stated deadline receive a shopping credit increased by 65 percent of the rate-stabilization charge for the first year, 75 percent for the second year, and 85 percent for the third year of the plan. Residential customers whose aggregator agrees not to return to FirstEnergy's generation service during the plan and who agree to pay market price if they do return receive a credit of 100 percent of the rate-stabilization charge.

{¶ 23} OCC and the governmental aggregators claim that these differing credits violate R.C. 4905.32, 4905.33, and 4905.35, and that they discriminate against customers who are not capable of being served by governmental aggregators. The PUCO, however, did modify FirstEnergy's plan, directing that nongovernmental aggregators be eligible for the same credit as governmental aggregators. June 9, 2004 PUCO Opinion at 30–31. Furthermore, R.C. 4905.33 " 'does not prohibit rate discrimination *per se*; rather, it prohibits charging different rates when the utility is performing " * * * a like and contemporaneous service under substantially the same circumstances and conditions. * * *" R.C. 4905.35 is to the same effect, and prohibits " * * * unreasonable prejudice or disadvantage * * *." ' " *AK Steel Corp. v. Pub. Util. Comm.* (2002), 95 Ohio St.3d 81, at 86–87, 765 N.E.2d 862, quoting *Mahoning Cty. Twps. v. Pub. Util. Comm.* (1979), 58 Ohio St.2d 40, 43–44, 12 O.O.3d 45, 388 N.E.2d 739.

{¶ 24} The statutes do not require uniformity in utility prices and rates. "A reasonable differential or inequality of rates may occur where such differential is based upon some actual and measurable differences in the furnishing of services

to the consumer." *Mahoning Cty. Twps.*, 58 Ohio St.2d at 44, 12 O.O.3d 45, 388 N.E.2d at 739.

{¶ 25} It was reasonable for the PUCO to approve a provision allowing residential aggregation groups and commercial and industrial customers to qualify for larger credits against the rate-stabilization charge, since their agreeing to stay with a competitive supplier can greatly reduce FirstEnergy's provider-of-last-resort risk, for which the rate-stabilization charge compensates. In *Weiss v. Pub. Util. Comm.* (2000), 90 Ohio St.3d 15, 734 N.E.2d 775, we rejected claims of discrimination pursuant to R.C. 4905.33 and 4905.35, holding that classification of customers based upon whether they had competitive alternatives for electric service was reasonable and lawful. We held that R.C. 4905.31, 4905.33, and 4905.35 do not prohibit all discrimination, preferences, or advantages. Id. at 16, 734 N.E.2d 775. When utility services are rendered under different circumstances or conditions, differences in prices are not proscribed by R.C. 4905.33. Id.

{¶ 26} In this case, FirstEnergy's provider-of-last-resort risks are different for different customer groups. Rational distinctions between customers are permitted. *AK Steel*; *Mahoning Cty. Twps.*, supra. The level of provider-of-last-resort risk that shopping customers impose on FirstEnergy determines how much, if any, of the rate-stabilization charge they will pay.

{¶ 27} Because the rate-stabilization charge relates to FirstEnergy's cost of planning to cover returning customers, it is reasonable that the residential aggregation groups, which significantly affect FirstEnergy's risks as provider of last resort, should qualify for credits to avoid these costs when they contract with another supplier. Since customer qualification for these shopping credits is based upon a rational distinction, there has been not violation of R.C. 4905.31, 4905.33, or 4905.35. We therefore affirm the PUCO's findings regarding proposition three.

### Interest on Shopping–Credit Deferrals

{¶ 28} The governmental aggregators next challenge the portion of FirstEnergy's plan that allows for imposition of interest charges that were prohibited under a previous case. On July 19, 2000, the PUCO approved a stipulation and recommendation in FirstEnergy's transition-plan proceeding.[12] The governmental aggregators claim that the part of the rate-stabilization plan that allows interest on shopping-credit deferrals violates this stipulation, which cannot be

---

12. *In re Application of FirstEnergy Corp. on Behalf of the Ohio Edison Co., the Cleveland Elec. Illuminating Co., & the Toledo Edison Co. for Approval of Their Transition Plans & for Authorization to Collect Transition Revenues,* case No. 99–1212–EL–ETP (July 19, 2000) ("ETP Order").

modified without consent. They also argue that collateral estoppel applies and that the PUCO has failed to respect precedent.

{¶ 29} OCC and the governmental aggregators rely on Section VIII(2) of the stipulation, which states, "The difference between the market support price, as reflected in Attachment 2, and the incentivized shopping credit, as reflected in Attachment 3, both as reflected in the respective tariff of the customers who shop times their kWh usage will be deferred as RTC and tracked as set forth below. *No interest charges will be capitalized on such deferrals*." (Emphasis added.)

{¶ 30} The stipulation, however, also provides, in Section V(2), that if more than a 20 percent shopping level is attained by the residential class of customers, the shopping-credit incentives *"may be adjusted in subsequent years as deemed appropriate by the Commission to minimize deferrals."* (Emphasis added.) In considering the question of interest, the PUCO first noted that, even after the 20 percent shopping level had been reached, the PUCO had not adjusted shopping incentives to minimize deferrals, and, thus, the balance tipped in favor of encouraging shopping, at FirstEnergy's expense. As a result, the deferred-shopping-credit balance was over $500 million more than the amount contemplated at the time the stipulation was approved. June 9, 2004 PUCO Opinion at 27.

{¶ 31} After reviewing the evidence, the PUCO determined that there was a need to balance the detrimental effect of large deferrals with the need for marketers to meet contractual responsibilities based on anticipated shopping-credit levels. Id. Therefore, rather than reducing shopping credits, which could reduce shopping, the PUCO decided to allow accrual of interest on the deferred-shopping-credit balance "to minimize the impact of deferrals on FirstEnergy as authorized in the ETP [electric-transition plan]." Id. Considering those circumstances, which differed from those anticipated at the time of the transition-plan stipulation, the PUCO's approval of the interest provision is reasonable. Moreover, the doctrine of collateral estoppel does not apply, because the rate-stabilization plan dealt with different issues and time frames. We therefore affirm the PUCO's determination.

### Extension of Financial–Separation Waiver

{¶ 32} Finally, the governmental aggregators argue that, by extending its waiver of the R.C. 4928.17(A) financial-separation requirement, the PUCO acted unlawfully and unreasonably. The extension relates to one of the two temporary waivers that the PUCO granted when it approved FirstEnergy's electric-transition plan. See ETP Order at 26–27. One waiver granted in that order related to requiring "financial separation due to financial entanglements involving the generating assets of FirstEnergy." June 9, 2004 PUCO Opinion at 40 (describing the earlier waivers). The second was a general waiver for wherever FirstEner-

gy's plan was not in exact compliance with the statutory or rule requirements regarding full structural separation. Id; ETP Order at 27.

{¶33} R.C. 4928.17(C) expressly provides that the PUCO may issue an order approving a corporate-separation plan that does not comply with division (A)(1) of the statute but that "complies with such functional separation requirements as the commission authorizes to apply for an interim period prescribed in the order" upon a finding that such an alternative plan will continue to comply with R.C. 4928.02. Based upon the evidence, including testimony on the need for, and the effectiveness of, a modified separation plan, the PUCO found that FirstEnergy had established good cause to allow approval of an alternative functional-separation plan pursuant to R.C. 4928.17(C) and reaffirmed that decision on rehearing.

{¶34} As part of its proposed rate-stabilization plan, FirstEnergy sought to extend the two waivers granted in the electric-transition plan. The PUCO denied FirstEnergy's request for extension of the general corporate-separation waiver because of the breadth of the request and the lack of any specificity as to the areas of noncompliance. June 9, 2004 PUCO Opinion at 51 (finding No. 22). It explained, "The Commission cannot grant a waiver where the applicant has been unable to state the actual company process, program or function that requires the waiver." Id. at 40.

{¶35} The PUCO did find it appropriate, however, to extend its waiver of the financial-separation requirement. Id. at 51 (finding No. 22). The PUCO found that lackluster economic conditions inhibited the retirement of debt associated with FirstEnergy's generating facilities. Id. This, in turn, prevented FirstEnergy from removing existing financial obligations that would allow it to divest these facilities. Id. at 40. The PUCO concluded: "In consideration of the economic conditions that inhibited the retirement of the debt associated with the facilities, FirstEnergy has shown good cause to extend the financial separation waiver." Id. at 51 (finding No. 22). Thus, the PUCO did not waive a statutory requirement, as OCC asserts. Rather, as permitted by R.C. 4928.17(C), the PUCO authorized a functional-separation plan.

{¶36} The governmental aggregators argue that the PUCO's approval of the extension violates R.C. 4928.17(A) and grants FirstEnergy undue preference, unfair competitive advantage, and abusive market power. These arguments, however, suffer from a lack of specificity and proof.

{¶37} The PUCO approved an extension of FirstEnergy's alternative functional-separation plan issued in the electric-transition plan upon a finding of good cause. Id. This is a factual determination, and this court has consistently refused to substitute its judgment for that of the PUCO on factual matters. *Ohio Edison Co. v. Pub. Util. Comm.* (1997), 78 Ohio St.3d 466, 469, 678 N.E.2d 922.

### Conclusion

{¶ 38} R.C. 4903.13 provides that a PUCO order shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order unlawful or unreasonable. We recognize that the PUCO faces a market that has not fully developed as envisioned by the General Assembly; however, this does not empower the PUCO to create remedies outside the perimeters of the law. Therefore, because the PUCO approved the implementation of a rate-stabilization plan in this instance for the purchase of retail electric service, the price of which had not been determined through a competitive-bidding process, and made a unilateral decision to eliminate the offer to customers of a price determined through competitive bids without developing a reasonable means for customer participation, its actions fell outside the perimeters of R.C. 4928.14(B) and are, in that regard, unlawful. Accordingly, we are compelled to remand that portion of the decision for further consideration of this plan by the PUCO and its compliance with R.C. 4928.14(B). In all other aspects, we affirm the decision of the PUCO.

Judgment accordingly.

MOYER, C.J., RESNICK, PFEIFER and LUNDBERG STRATTON, JJ., concur.

O'CONNOR and LANZINGER, JJ., concur in part and dissent in part.

---

**LANZINGER, J., concurring in part and dissenting in part.**

{¶ 39} Although I concur in its other holdings, I respectfully dissent from the majority's holding that the Public Utilities Commission's ("PUCO's") order violates R.C. 4928.14(B). I believe that *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, requires an affirmance of the PUCO's rate-stabilization-plan approval.

{¶ 40} This court has consistently deferred to the commission's judgment in matters that require the commission to apply its special expertise and discretion with regard to factual matters. *Cincinnati Bell Tel. Co. v. Pub. Util. Comm.* (2001), 92 Ohio St.3d 177, 180, 749 N.E.2d 262; *AT & T Communications of Ohio, Inc. v. Pub. Util. Comm.* (1990), 51 Ohio St.3d 150, 154, 555 N.E.2d 288; *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.* (1976), 46 Ohio St.2d 105, 108, 75 O.O.2d 172, 346 N.E.2d 778. "Due deference should be given to statutory interpretations by an agency that has accumulated substantial expertise and to which the General Assembly has delegated enforcement responsibility." *Weiss v. Pub. Util. Comm.* (2000), 90 Ohio St.3d 15, 17–18, 734 N.E.2d 775, citing *Collinsworth v. W. Elec. Co.* (1992), 63 Ohio St.3d 268, 272, 586 N.E.2d 1071.

{¶ 41} The majority has failed to follow this deferential standard in determining that the commission exceeded its statutory authority by approving the rate-stabilization plan. According to the majority, the commission-approved rate-stabilization plan does not comport with R.C. 4928.14(B) because no reasonable means for customer participation is ensured. The conclusion, however, departs from the precedent of *Constellation,* which the majority minimizes on the grounds that it involved consumers who stipulated away their right to a competitive-bid pricing plan.

{¶ 42} Yet in *Constellation,* we did more than simply consider a stipulation. In that case, the PUCO had approved a rate-stabilization plan for Dayton Power & Light Company ("DP & L") similar to that proposed here by FirstEnergy, and DP & L's competitor, Constellation NewEnergy, Inc., mounted the same type of legal challenge in that case as do the appellants in this case. Constellation argued that DP & L's rate-stabilization plan "unlawfully circumvents Section 4928.14(B), Revised Code, by adopting an alternative to the statutorily mandated competitive bid-out before the rules on competitive bid-out were adopted." *Constellation,* 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, at ¶ 44. In other words, just as the Ohio Consumers' Counsel ("OCC") argues, Constellation had argued that the PUCO had no authority to approve a market-based standard-service offer without entering a competitive-bid process under R.C. 4928.14(B).

{¶ 43} In *Constellation,* this court was convinced that the stipulation setting forth DP & L's plan complied with R.C. 4928.14(B). 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, at ¶ 46–49. We also determined that DP & L's plan satisfied the competitive-bidding requirements of the statute because (1) the stipulation " 'provides for ongoing Commission review of market-based rates, through a competitive bidding process, if necessary,' " (2) the stipulation " 'provides that, if market-based rates do not reasonably reflect the rates established by the Stipulation, then the Commission may terminate the RSP [rate-stabilization plan] and trigger a competitive bidding process,' " and (3) " 'the Voluntary Enrollment Procedure provides DP & L customers the opportunity to choose any certified competitive retail supplier, thus providing customers with an option to select a marketer and a reasonable method to participate.' " *Constellation,* 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 48, quoting the PUCO decision. Applying the appropriate standard of review, we held that the PUCO's approval of DP & L's plan was reasonable and lawful. Id. at ¶ 52–53.

{¶ 44} In short, we have previously affirmed a PUCO decision approving a rate-stabilization plan similar to the one the PUCO approved in this case. In fact, the PUCO's planned ongoing review of FirstEnergy's rate is actually better than its review in *Constellation,* for FirstEnergy's rate was already tested in a competitive bid and was found to be the lowest. Just as in *Constellation,* the

commission reserved the ability to terminate the rate-stabilization plan if it appears that it no longer provides customers with market-based rates.

{¶ 45} The PUCO, in its June 9, 2004 order, summarized its rationale and addressed pertinent statutes in approving FirstEnergy's proposed rate-stabilization plan: "The Commission finds that the procedure set forth in the RSP [rate-stabilization plan], as modified by the Commission, does provide consumers with market-based rates. Based upon the pricing information provided by various parties to this proceeding, we find that the Applicants' 4.6 cents/kWh price for generation during 2006 through 2008 is a reasonable reflection of what market prices may be during that period. Additionally, the Commission has substantially limited the cost adjustments for generation service to those relating to taxes and for distribution service to those set forth in the existing ETP [electric-transition plan] settlement. More importantly, however, adequate safeguards are in place to allow the Commission to monitor the prices and confirm that, over time, those prices remain market-based and that consumers have adequate options for choosing among generation suppliers. Through this order, the Commission is directing that FirstEnergy undertake a CBP [competitive-bidding process] to ensure that customers receive the benefits of CBP rates should they be lower than rates established through a RSP. The RSP that we propose complies with the requirements of Section 4928.14, Revised Code. Section 4928.14, Revised Code, provides the Commission with flexibility in approving processes for determining market-based rates for the standard service offer. We find that, for FirstEnergy, the methodology for establishing a MBSSO [market-based standard-service offer] set forth in this order is reasonable. We also find that, by establishing the MBSSO with price monitoring, the RSP provides a reasonable alternative to a more traditional CBP, provides for a reasonable means of customer participation, and fulfills the requirements of Section 4928.14(B), Revised Code." *In re Applications of Ohio Edison Co., the Cleveland Elec. Illuminating Co. & the Toledo Edison Co. for Authority to Continue & Modify Certain Regulatory Accounting Practices & Procedures, for Tariff Approval & to Establish Rates & Other Charges Including Regulatory Transition Charges Following the Market Dev. Period,* case No. 03–2144–EL–ATA, 2004 WL 1493955 (June 9, 2004) 45 ("June 9, 2004 Commission Opinion").

{¶ 46} With *Constellation* as clear precedent, it is baffling how the majority can find unlawful the PUCO's order approving FirstEnergy's rate-stabilization plan. No one specifically complains that the plan is deficient for lack of a reasonable means for customer participation pursuant to R.C. 4928.14(B). Yet without anyone arguing that the rate-stabilization plan fails to meet requirements for reasonable means for customer participation, the majority finds this to be so.

{¶ 47} The majority says that "the record here contains nothing to persuade us that a reasonable means for customer participation has been developed as required by R.C. 4928.14(B)" and continues by stating that "[t]he absence of a stipulation signed by customer groups factually distinguishes this case from *Constellation.*" Apparently, it believes that "a reasonable means for customer participation [was] developed" in *Constellation* because the rate was developed through negotiation among representatives of broad customer groups. The last sentence in R.C. 4928.14(B), however, is a prospective requirement: "The commission *may determine at any time that a competitive bidding process is not required,* if other means to accomplish generally the same option for customers is readily available in the market *and a reasonable means for customer participation is developed.*" (Emphasis added.) As it explained in its order, the commission did find both requirements satisfied.

{¶ 48} Contrary to the majority's implication, the existence of a stipulation in *Constellation* and the absence of a stipulation signed by customer groups from each class in this case does not mean that one provided "a reasonable means for customer participation," as required by R.C. 4928.14(B), while the other did not. In *Constellation,* the commission found, and we agreed, that the stipulation included a " 'Voluntary Enrollment Procedure [that] provides DP & L customers the opportunity to choose any certified competitive retail supplier, thus providing customers with an option to select a marketer and a reasonable method to participate.' " *Constellation,* 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 48, quoting the PUCO's decision in that case.

{¶ 49} Likewise, in this case, the commission-modified rate-stabilization plan extends shopping credits and enhances them to encourage customers to select energy generation supplied by a competitive retail electric service. In addition, the commission further provides customers reasonable methods to participate by ordering (1) "[t]hat FirstEnergy undertake a CBP [competitive-bidding process] consistent with this order and schedule a meeting with [its] staff and other interested parties to this proceeding to establish further requirements of the CBP" and (2) "[t]hat interested parties to this proceeding * * * meet to determine the best approach for billing shopping customers for retail transmission, net congestion, and ancillary services once the MDP [market-development period] has ended." The requirement that reasonable means for customer participation be developed does not depend on whether a broad-based customer stipulation exists.

{¶ 50} Finally, in acting on FirstEnergy's application, the PUCO did not act arbitrarily to eliminate an offer determined through competitive bids. In its decision, the PUCO reviewed an affidavit and the testimony of four witnesses regarding projected wholesale and retail prices for electric generation for 2006

through 2008 and then made specific findings with respect to both R.C. 4928.14(A), June 9, 2004 Commission Opinion at 44–45, and R.C. 4928.14(B), id. at 52 (finding No. 27). In summary, the PUCO acted as the General Assembly authorized it to do and in a way we had previously approved in *Constellation.*

{¶ 51} As was indicated by Chief Justice Moyer in writing for the court in *Constellation:*

{¶ 52} "R.C. 4903.13 provides that a PUCO order shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable. Under this statutory standard, this court will not reverse or modify a PUCO decision as to questions of fact when the record contains sufficient probative evidence to show that the PUCO's determination is not manifestly against the weight of the evidence and is not so clearly unsupported by the record that it shows misapprehension, mistake, or willful disregard of duty. *AT & T Communications of Ohio, Inc. v. Pub. Util. Comm.* (2000), 88 Ohio St.3d 549, 555, 728 N.E.2d 371. This court has consistently refused to substitute its judgment for that of the commission on evidentiary matters. See, e.g., *AK Steel Corp. v. Pub. Util. Comm.* (2002), 95 Ohio St.3d 81, 765 N.E.2d 862." *Constellation,* 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 50.

{¶ 53} In my view, appellants have failed to show that the record lacks probative evidence so as to show misapprehension, mistake, or willful disregard of duty on the part of the commission or that the commission's determinations were against the manifest weight of the evidence. Appellants have failed to convince me that we should substitute our judgment for that of the commission's on its approval of the rate-stabilization plan.

{¶ 54} Because I conclude that the PUCO's decisions with respect to FirstEnergy's rate-stabilization plan were reasonable and lawful, I would affirm them entirely.

O'CONNOR, J., concurs in the foregoing opinion.

## APPENDIX

{¶ 55} The Ohio Consumers' Counsel asserts the following propositions of law: (1) "Beginning January 1, 2006, an electric distribution utility is required to provide customers a market-based standard service offer under R.C. 4928.14(A) and an option to purchase electric service the price of which is determined through a competitive bid under R.C. 4928.14(B); the PUCO has no authority to approve plans that do not comport with the requirements for market-based standard service offers set forth at R.C. 4928.14(A) and offers determined through competitive bids set forth at R.C. 4928.14(B)"; (2) "The PUCO acted unlawfully in approving a so-called 'Rate Stabilization Charge' ('RSC') in violation

of R.C. 4928.38 and 4928.40, which require that the recovery of the Generation Transition Charge ('GTC') from customers ends on December 31, 2005; given that the amount of the RSC is the same as the GTC for each FirstEnergy operating company, the RSC allows unlawfully for the continuation of the recovery of GTC after December 31, 2005. The RSC is also anti-competitive in violation of R.C. 4928.17. In addition, the PUCO acted unlawfully in approving the RSC in that there is no basis in Ohio law for such a charge. The PUCO also approved the so-called RSCs as to what costs the charge was designed to recover and without evidence to justify the amount of the charge. The lack of evidentiary basis for the RSC violated R.C. 4903.09, which requires that, in contested cases, the PUCO's opinions be based upon findings of fact established on the record of an evidentiary hearing"; (3) "The PUCO erred when it approved discriminatory treatment among the same class of residential customers by requiring some customers to pay the entire unlawful RSC while allowing other customers to avoid certain percentages of the unlawful RSC based upon the date at which the customers shopped and the entity with which they shopped. Nothing in R.C. Chapter 4928 permits such undue discrimination; in addition, such discrimination is unlawful pursuant to R.C. 4905.32, which requires that the same charge be extended to all persons under like circumstances for like services; R.C. 4905.33, which requires that no utility charge any person more or less than another person for like service; and R.C. 4905.35, which prohibits discrimination in the provision of public utility service. There was also no evidence of record to justify the discriminatory provisions for the avoidance of certain percentages of the unlawful RSC"; (4) "The PUCO acted unlawfully and unreasonably by granting FirstEnergy a financial separation waiver in violation of FirstEnergy's corporate separation obligations set forth in R.C. 4928.17(A)"; and (5) "The PUCO acted unlawfully and unreasonably when it authorized FirstEnergy to renege on the terms of the April 17, 2000 Stipulation and Recommendation executed in *The Application of FirstEnergy Corp. on Behalf of Ohio Edison Company, The Cleveland Electric Illuminating Company and The Toledo Edison Company for Approval of their Transition Plans and for Authorization to Collect Transition Revenues*, PUCO Case No. 99–1212–EL–ETP, which the PUCO approved in its July 19, 2000 Opinion and Order, by permitting FirstEnergy to collect interest on shopping credit deferrals."

{¶ 56} The governmental aggregators assert the following propositions of law: (1) "The Commission may not approve a market-based standard service offer that deviates from the requirements specified in R.C. 4928.14(A) and the Commission's rules"; (2) "The Commission may not permit the substitution of a standard service offer in place of rates obtained by the competitive bid process specified in R.C. 4928.14"; (3) "The Commission may not approve, without proper legislative authority, a Rate Stabilization Plan that deviates from the provisions of R.C.

Chapter 4928"; (4) "The Commission may not permit an electric distribution utility to collect generation fees from customers that are paying generation fees to a competitive supplier"; and (5) "The Commission may not approve the retroactive imposition of interest charges on rates that are capped by both R.C. 4928.34(A)(6) and a Commission-approved electric transition plan."

---

Janine L. Migden–Ostrander, Ohio Consumers' Counsel, and Kimberly W. Bojko and Jeffrey L. Small, Assistant Consumers' Counsel, for appellant Ohio Consumers' Counsel.

Barbara E. Herring, Toledo Law Director, Kerry Bruce, and Leslie A. Kovacik, for appellant city of Toledo.

Julia R. Bates, Lucas County Prosecuting Attorney, and Lance M. Keiffer, for appellant Lucas County Board of Commissioners.

Peter D. Gwyn, Perrysburg Law Director, for appellant city of Perrysburg.

Brian J. Ballenger, Northwood Law Director, for appellant city of Northwood.

Paul S. Goldberg, Oregon Law Director, and Phillip D. Wurster, for appellant city of Oregon.

Sheilah H. McAdams, Maumee Law Director, for appellant city of Maumee.

James E. Moan, Sylvania Law Director, for appellant city of Sylvania.

Paul Skaff, Assistant Holland Village Solicitor, for appellant village of Holland.

Jim Petro, Attorney General, Duane W. Luckey, Senior Deputy Attorney General, and William L. Wright and Thomas W. McNamee, Assistant Attorneys General, for appellee Public Utilities Commission of Ohio.

Jones Day, Paul T. Ruxin, and Helen L. Liebman; and Kathy J. Kolich and James W. Burk, for intervening appellee FirstEnergy Corporation.

McNees Wallace & Nurick L.L.C., Samuel C. Randazzo, Lisa G. McAlister, and Daniel J. Neilsen, for intervening appellee Industrial Energy Users–Ohio.

Henry W. Eckhart, urging reversal for amicus curiae, Representative Dennis Kucinich, Tenth Congressional District of Ohio.