ELYRIA FOUNDRY COMPANY ET AL., APPELLANTS, v. PUBLIC
UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as *Elyria Foundry Co. v. Pub. Util. Comm.*,
114 Ohio St.3d 305, 2007-Ohio-4164.]

(No. 2006–0830—Submitted February 27, 2007—Decided August 29, 2007.)

LUNDBERG STRATTON, J.

## Background

{¶ 1} These are appeals as of right by appellants, Elyria Foundry Company ("Elyria") and WPS Energy Services, Inc. ("WPS"), from orders of the Public Utilities Commission of Ohio ("commission" or "PUCO") in case Nos. 05–704–EL–ATA, 05–1125–EL–ATA, 05–1126–EL–AAM, and 05–1127–EL–UNC. The commission's order approved a "rate-certainty plan" filed by FirstEnergy Corporation on behalf of its operating companies: Ohio Edison, Toledo Edison, and Cleveland Electric Illuminating (collectively, "FirstEnergy"). We allowed FirstEnergy and Industrial Energy Users–Ohio ("IEU") to intervene as appellees.

{¶ 2} The backdrop for these appeals is Am.Sub.S.B. No. 3, 148 Ohio Laws, Part IV, 7962 ("S.B. 3"), which enacted R.C. Chapter 4928 and restructured Ohio's electric-utility industry to achieve a goal of retail competition in the generation component of electric service. S.B. 3 provided for a transition period, termed the "market-development period," during which an electric utility's rates were subject to certain regulatory requirements. FirstEnergy's market-development period ended December 31, 2005.

{¶ 3} In response to the commission's concern over market prices at the end of the market-development period, FirstEnergy filed a "rate-stabilization plan" aimed at preventing the expected rate shock of moving to market rates. The commission authorized FirstEnergy to file an application to adjust its electricity-generation charges to recover increases in the cost of fuel from January 1, 2006, through 2008. The application was limited to fuel-cost increases that were above FirstEnergy's fuel costs for 2002. According to the rate-stabilization plan, the commission would approve the recovery of increased fuel costs only after a hearing and upon FirstEnergy's justification of the generation-rate increase.

{¶ 4} Pursuant to the commission's order, FirstEnergy filed an application seeking to recover its increased fuel costs for 2006 through 2008. FirstEnergy sought to recover these costs from all customers of FirstEnergy's generation services through the approval of a "generation-charge adjustment rider." See case No. 05–704–EL–ATA.

{¶ 5} Numerous parties intervened in the case on the generation-charge adjustment rider, opposing the rider as an unacceptable increase in retail rates. As a result, FirstEnergy made another filing, proposing a "rate-certainty plan" as an alternative to the generation-charge adjustment rider. See case Nos. 05–1125–EL–ATA, 05–1126–EL–AAM, and 05–1127–EL–UNC. FirstEnergy characterized the rate-certainty plan as a means to address public opposition to FirstEnergy's recovery of increased fuel costs.

{¶ 6} FirstEnergy submitted the rate-certainty plan along with a stipulation and supplemental stipulation with several parties agreeing to the provisions set forth in the plan. FirstEnergy stated that if the rate-certainty plan was approved, the request for the generation-charge adjustment rider would be moot.

{¶ 7} The rate-certainty plan was, among other things, intended to (1) mitigate for customers the effects of FirstEnergy's recovery of increased fuel costs from 2006 through 2008, (2) maintain level distribution rates for 2006 through 2008, and (3) defer a portion of FirstEnergy's expenditures for system infrastructure and improvements in reliability.

{¶ 8} On November 29, 2005, the commission held an evidentiary hearing and considered the stipulation on the rate-certainty plan as a contested stipulation. The commission also heard evidence on the request for the generation-charge adjustment rider. FirstEnergy presented witnesses in support of the generation-charge adjustment rider and the rate-certainty plan. The commission staff sponsored witnesses on the generation-charge adjustment rider. Constellation NewEnergy, like WPS, a competitive provider of retail electric service, presented testimony opposing the rate-certainty plan.

{¶ 9} On January 4, 2006, the commission approved the stipulation on the rate-certainty plan after clarifying certain provisions. The stipulation, as approved by the commission, allowed FirstEnergy to defer recovery of up to $150 million in expenses related to its electricity-distribution systems in each year in which the rate-certainty plan is in effect. The deferred distribution expenses included costs FirstEnergy intended to incur to improve its infrastructure and reliability.

{¶ 10} The commission's order also provided FirstEnergy with a partial recovery of increased fuel costs during the plan period through a "fuel-recovery mechanism." Through this mechanism, FirstEnergy will recover from all Ohio Edison and Toledo Edison distribution and transmission customers fuel costs in the amounts of $75 million in 2006, $77 million in 2007, and $79 million in 2008.

In order to maintain stable rates throughout the plan period, the fuel-recovery mechanism is offset by a reduction in the regulatory transition charge. Increased fuel costs incurred by the Cleveland Electric Illuminating Company ("CEI") would be deferred during the plan period for later recovery. The rate-certainty plan further provided that all deferred expenses for fuel and distribution will be capitalized with carrying charges on the FirstEnergy companies' books of accounts and recovered over a 25–year period as regulatory assets, beginning in 2009.

{¶ 11} FirstEnergy, Elyria, and WPS each filed a timely application for rehearing. On January 25, 2006, the commission granted FirstEnergy's application in part, clarifying and modifying its approval of the rate-certainty plan. On March 1, 2006, the commission denied the applications of Elyria and WPS.

{¶ 12} Elyria, an industrial customer of FirstEnergy, and WPS, a competitive provider of retail electric service in FirstEnergy's service area, have appealed to this court as a matter of right.

## Standard of Review

{¶ 13} "R.C. 4903.13 provides that a PUCO order shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable." *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 50. We will not reverse or modify a PUCO decision as to questions of fact when the record contains sufficient probative evidence to show that the commission's decision was not manifestly against the weight of the evidence and was not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *Monongahela Power Co. v. Pub. Util. Comm.*, 104 Ohio St.3d 571, 2004-Ohio-6896, 820 N.E.2d 921, ¶ 29. The appellant bears the burden of demonstrating that the PUCO's decision is against the manifest weight of the evidence or is clearly unsupported by the record. Id.

{¶ 14} Although we have "complete and independent power of review as to all questions of law" in appeals from the PUCO, *Ohio Edison Co. v. Pub. Util. Comm.* (1997), 78 Ohio St.3d 466, 469, 678 N.E.2d 922, we may rely on the expertise of a state agency in interpreting a law when "highly specialized issues" are involved and "where agency expertise would, therefore, be of assistance in discerning the presumed intent of our General Assembly." *Consumers' Counsel v. Pub. Util. Comm.* (1979), 58 Ohio St.2d 108, 110, 12 O.O.3d 115, 388 N.E.2d 1370.

## Elyria Foundry Appeal

### Proposition of Law No. II

{¶ 15} In proposition of law No. II, Elyria contends that the commission exceeded its statutory authority under R.C. 4905.13 by modifying accounting

procedures to provide regulatory incentives to FirstEnergy. Elyria challenges the PUCO's decision to allow FirstEnergy to capitalize and defer distribution expenses and costs for infrastructure improvements and increased reliability.

{¶ 16} The commission approved the stipulation provision allowing FirstEnergy to capitalize and defer up to $150 million in distribution expenses in each of the three years the rate-certainty plan is in effect, 2006 through 2008. The distribution deferral included costs incurred for FirstEnergy's "infrastructure improvements" and "reliability needs," including "vegetation management," maintenance, storm preparation, and repair of storm damage. The commission noted that the proposal to capitalize and defer distribution expenses is a departure from standard public-utility ratemaking and accounting policies, which require that "ordinary expenses * * * must be recovered, if at all, through annual [rate] revenues." Nevertheless, the commission found that FirstEnergy clearly needed significant and costly infrastructure improvements. Further, the commission believed that it was important to encourage FirstEnergy, through regulatory incentives, to make those improvements quickly.

{¶ 17} Elyria maintains that the creation of regulatory incentives exceeds the commission's authority under R.C. 4905.13 for prescribing accounts of public utilities. Elyria further argues that in granting the distribution deferral, the commission ignored the distinction between its power over accounts and its ratemaking authority, which it retains as to distribution services under R.C. 4909.15, 4909.18, and 4909.19.

{¶ 18} R.C. 4905.13 grants the commission authority to establish a system of accounts for public utilities and to prescribe the manner in which the accounts must be kept. We have recognized the commission's discretion under R.C. 4905.13 and have held that we "generally will not interfere with the accounting practices set by the commission." *Consumers' Counsel v. Pub. Util. Comm.* (1987), 32 Ohio St.3d 263, 271, 513 N.E.2d 243. Moreover, we have stated that where, as here, "a statute does not prescribe a particular formula, the PUCO is vested with broad discretion." *Payphone Assn. of Ohio v. Pub. Util. Comm.,* 109 Ohio St.3d 453, 2006-Ohio-2988, 849 N.E.2d 4, at ¶ 25, citing *Columbus v. Pub. Util. Comm.* (1984), 10 Ohio St.3d 23, 24, 10 OBR 175, 460 N.E.2d 1117.

{¶ 19} The commission's authority pursuant to R.C. 4905.13 over public-utility accounting practices is distinct from the ratemaking statutes in R.C. Chapter 4909. See *Consumers' Counsel v. Pub. Util. Comm.* (1983), 6 Ohio St.3d 377, 378–379, 6 OBR 428, 453 N.E.2d 673; *Dayton Power & Light Co. v. Pub. Util. Comm.* (1983), 4 Ohio St.3d 91, 104, 4 OBR 341, 447 N.E.2d 733. We have upheld the commission's accounting orders when the accounting procedure did not affect current rates and the ratemaking effect of the accounting order would be reviewed in a later rate proceeding. See *Consumers' Counsel v. Pub. Util.*

*Comm.* (1992), 63 Ohio St.3d 522, 524, 589 N.E.2d 1267; *Dayton Power & Light Co.*, 4 Ohio St.3d at 104, 4 OBR 341, 447 N.E.2d 733.

{¶ 20} In this case, the deferral of distribution expenses in the accounting order does not affect customers' distribution rates while the rate-certainty plan is in effect. FirstEnergy's distribution rates will remain at the same levels as base distribution rates established in FirstEnergy's transition-plan case until the rate-certainty plan expires on December 31, 2008.[1] Moreover, the commission will consider whether these deferred expenses are recoverable when it reviews the FirstEnergy companies' next distribution rate cases.

{¶ 21} Nevertheless, Elyria claims that the commission provided no procedures for opposing parties to challenge the ratemaking effect of the accounting order when setting rates. According to Elyria, the commission limited its ratemaking review to determining whether costs were prudently incurred, and it provided FirstEnergy with specific assurances that it will recover these expenses through future rate proceedings.

{¶ 22} However, Elyria misconstrues the commission's order. That order provides that the commission will scrutinize FirstEnergy's distribution deferrals to ensure that those costs are "reasonable and appropriately incurred, [and] clearly and directly related to specifically necessary infrastructure improvements and reliability needs." To accomplish this oversight, the commission required FirstEnergy to establish separate accounts for each project, which the commission's staff will review annually for reasonableness. Deferrals are also subject to the commission's public-reporting requirements. The records will then be available for the commission's consideration in deciding whether those deferred amounts will be incorporated into future rates. In other words, the prudence review that Elyria complains of will be conducted in relation to the accounting deferrals, and not to the recoverability of deferred expenses in a future rate proceeding. There is nothing in the commission's accounting order to suggest that it will fail in its statutory duty to conduct thorough rate reviews in the FirstEnergy companies' future distribution rate cases. Furthermore, nothing prevents Elyria, or any other party, from challenging the recovery of the deferred distribution expenses in FirstEnergy's next rate case.

{¶ 23} In sum, Elyria has failed to prove that the commission violated R.C. 4905.13 when it allowed FirstEnergy to modify its accounts to defer distribution expenses. Therefore, we overrule Elyria's proposition of law No. II.

---

1. FirstEnergy's rate-stabilization plan required that it maintain this same level of distribution rates through December 31, 2007. Thus, the rate-certainty plan extended this period for one more year.

## Proposition of Law No. I

{¶ 24} In proposition of law No. I, Elyria claims that the commission's findings allowing FirstEnergy to capitalize and defer distribution expenses lacked record support for the infrastructure improvements as required by R.C. 4903.09.

{¶ 25} The commission acknowledged that the rate-certainty plan's proposal to capitalize and defer distribution expenses departed from standard practices requiring that ordinary expenses be recovered through annual revenues. The commission stated that it was within its discretion to grant the deferrals, but before it would allow FirstEnergy to treat distribution-related expenses different-ly from ordinary expenses, it was necessary to find "both exigent circumstances and good reason."

{¶ 26} The commission found that exigent circumstances existed to deviate from standard practices because FirstEnergy was "clearly in need of significant and costly improvements to their infrastructure." Further, the commission determined that "it is important for [FirstEnergy] to be encouraged through regulatory incentives to quickly accomplish those improvements."

{¶ 27} Elyria contends that there is no record support for the finding that FirstEnergy needed significant and costly infrastructure improvements. Elyria is correct that the commission cited no record evidence in its order to support this finding.

{¶ 28} Nevertheless, the PUCO and FirstEnergy both counter that the record contains factual support for the finding. The PUCO cites testimony that FirstEnergy is making substantial current investments in maintenance and improvements to the reliability of its distribution system, even though these investments cannot be recognized in rates until at least 2009. FirstEnergy points to evidence that the rate-certainty plan was intended to "encourage expenditures to further improve distribution service reliability." And further, FirstEnergy argues, "implicit in the Stipulation is the agreement of the signatory parties * * * that the expenditures for infrastructure maintenance and improvements and for reliability that will be deferred are necessary, and that the deferrals are a reasonable way to ensure that those expenditures will be made." In its rehearing entry on this issue, the commission referred to the same testimony and further noted that the stipulation on the rate-certainty plan identifies the expense categories for which significantly increased expenditures are anticipated.

{¶ 29} We find that none of this evidence provided a factual basis supporting the commission's finding that FirstEnergy was "clearly in need of significant and costly improvements to their infrastructure." Neither the PUCO nor FirstEner-gy has cited any evidence that FirstEnergy cannot maintain a reliable distribu-tion system under its current distribution rates or that the deferrals were necessary to address concerns over the reliability of the system.

{¶ 30} R.C. 4903.09 requires that a commission order must provide, "in sufficient detail, the facts in the record upon which the order is based, and the reasoning followed by the PUCO in reaching its conclusion." *MCI Telecommunications Corp. v. Pub. Util. Comm.* (1987), 32 Ohio St.3d 306, 312, 513 N.E.2d 337. Because there was no factual basis to support the commission's finding of exigent circumstances to deviate from standard practices in granting the distribution deferral, the commission violated R.C. 4903.09.

{¶ 31} However, while the commission abuses its discretion if it renders an opinion on an issue without record support, *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.* (1996), 76 Ohio St.3d 163, 166, 666 N.E.2d 1372, we will not reverse a commission order unless the party seeking reversal demonstrates the prejudicial effect of the order. *Tongren v. Pub. Util. Comm.* (1999), 85 Ohio St.3d 87, 92, 706 N.E.2d 1255, citing *Holladay Corp. v. Pub. Util. Comm.* (1980), 61 Ohio St.2d 335, 15 O.O.3d 426, 402 N.E.2d 1175, at syllabus.

{¶ 32} In this case, Elyria has not demonstrated prejudice with respect to the finding of exigent circumstances. First, Elyria, a customer of FirstEnergy, is not prejudiced, because current rates are not affected by the accounting deferrals and because Elyria can challenge the recovery of deferred distribution expenses in the FirstEnergy companies' next distribution rate cases. The commission made it clear that "deferred amounts will be reviewed before they are incorporated into future rates." Thus, the commission's accounting order was not conclusive for ratemaking purposes. Cf. *Cincinnati v. Pub. Util. Comm.* (1992), 63 Ohio St.3d 366, 588 N.E.2d 775 (no prejudice resulting from an accounting order *having a ratemaking effect* where rate proceeding was still pending and appellant had a right of appeal).

{¶ 33} Second, the commission provided a process to ensure that the deferred expenses for improvements to and maintenance of its infrastructure are in fact necessary costs related to improving the reliability of its distribution system. The commission will scrutinize these deferred expenses to determine whether the "costs to be deferred are reasonable, appropriately incurred, clearly and directly related to specifically necessary infrastructure improvements and reliability needs of [FirstEnergy], and in excess of expense amounts already included in the rate structures of each of the [FirstEnergy] Companies." To accomplish this oversight, the commission required the FirstEnergy companies to establish separate accounts for each project for which they propose to defer expenses. The commission staff would then review the reasonableness and necessity of the deferred expenses in those accounts annually.

{¶ 34} Third, good cause existed to allow FirstEnergy to defer distribution-related expenses. The commission's decision to allow the deferrals was premised on the "understanding that the expenses related to infrastructure improvement

and the increased expenses for maintenance of infrastructure and reliability will yield necessary improvements that otherwise would have been realized, for company financial reasons, over a much longer period of time." In the cases on its rate-stabilization plan and its transition plan, FirstEnergy could have filed an application to increase distribution rates in 2008.[2] However, in order to stabilize customer rates that otherwise would have risen when FirstEnergy recovered increased fuel costs pursuant to its rate-stabilization plan, FirstEnergy agreed to maintain the same base rate for distribution until December 31, 2008, for Ohio Edison and Toledo Edison customers, and until April 30, 2009, for customers of CEI. As a result, any distribution-related expenses that FirstEnergy had previously incurred will not be included in FirstEnergy's base distribution rates until 2009 at the earliest. By granting the deferrals, the commission removed any disincentive for FirstEnergy to invest in infrastructure facilities and operations that was created by extending the existing freeze in distribution rates.

{¶ 35} In short, any prejudice or harm to Elyria at this juncture is speculative. Customer rates have not yet been increased as a result of the deferred distribution expenses, nor has the commission determined that FirstEnergy will be able to recover these expenses. Those issues will be properly resolved in the FirstEnergy companies' future distribution rate cases. For the foregoing reason, we reject Elyria's proposition of law No. I.

### Proposition of Law No. III

{¶ 36} In its third proposition of law, Elyria contends that the commission failed to consider the entire effect of the rate-certainty plan before concluding that ratepayers and the public interest benefit from its approval. Elyria argues that the commission unreasonably limited its consideration to the period of time that the rate-certainty plan is in place. Instead, Elyria maintains that the commission should have focused on the subsequent 25–year period when distribution deferrals will be amortized. According to Elyria, as a result of the one-year extension of FirstEnergy's distribution-rate freeze, customers will pay $64 million more for distribution services in 2009 than they would have paid in 2008. And because of the deferrals of distribution expenses, Elyria claims, an additional $800 million in carrying costs will be charged to customers to amortize deferrals over 25 years.

{¶ 37} Contrary to Elyria's assertion, we find that the commission did take into consideration the long-term implications of the rate-certainty plan. The commission acknowledged that the stipulation had "the potential to shift some current costs from current ratepayers to future ratepayers, as any well-considered and

---

2. See FirstEnergy Companies Rate Stabilization Plan (June 9, 2004), case No. 03–2144–EL–ATA, at 20–21.

approved regulatory asset accrual authorization will tend to do." However, the actual amount of costs to be borne by future ratepayers is entirely speculative. As the commission noted, any "deferred amounts will be reviewed before they are incorporated into future rates."

{¶ 38} Moreover, the commission's conclusion that the stipulation, as a package, benefits ratepayers and the public interest is amply supported by the record. The commission noted that absent the settlement, FirstEnergy ratepayers would have no choice but to pay higher and possibly unstable rates because of increasing fuel costs to FirstEnergy and the expiration of its distribution-rate freeze at the end of 2007. In addition, there was evidence that the total amount of deferred shopping incentives and interest payable by customers would be $263 million less under the rate-certainty plan than under the earlier approved rate-stabilization plan. Finally, testimony indicated that the stipulation provided rate certainty to customers until the plan expired, at which time rates were expected to decrease.

{¶ 39} Elyria is, in essence, asking us to reweigh the evidence and substitute our judgment for that of the commission. But that is not our prerogative in PUCO appeals. *Payphone Assn.*, 109 Ohio St.3d 453, 2006-Ohio-2988, 849 N.E.2d 4, at ¶ 16. As Elyria has not met its burden of showing that the commission's order on this issue was unlawful, unreasonable, or against the manifest weight of the evidence, we deny proposition of law No. III.

### Proposition of Law No. IV

{¶ 40} In proposition of law No. IV, Elyria maintains that the rate-certainty plan violates important regulatory principles and practices by providing FirstEnergy with regulatory incentives in violation of R.C. 4905.13.

{¶ 41} We reject this claim because it merely renews arguments that we have addressed in our discussion of Elyria's first two propositions of law. Elyria offers no new arguments for us to consider.

## WPS Services Appeal

### Propositions of Law Nos. 1 and 2

{¶ 42} In propositions of law Nos. 1 and 2, WPS contends that the commission approved accounting authorizations to defer fuel costs and other expense items [3] that were unlawful, unreasonable, and not in the public interest.

{¶ 43} In approving FirstEnergy's earlier rate-stabilization plan, the commission allowed FirstEnergy to request increases in generation rates during 2006–

---

3. WPS focuses primarily on the fuel-cost deferral, and its arguments addressing the deferral of distribution costs have been adequately addressed in the context of Elyria Foundry's appeal.

2008 to recover fuel-cost increases above its 2002 fuel costs. The order in the case on the rate-stabilization plan required FirstEnergy to apply for and justify any increase in generation rates and further required that the commission would approve increases only after a hearing and upon sufficient justification.

{¶ 44} FirstEnergy initially sought to recover its increased fuel costs through its request for the generation-charge adjustment rider, but after numerous parties opposed the rate increases outlined in the rider, FirstEnergy requested approval of its rate-certainty plan as an alternative. The rate-certainty plan creates a mechanism that allows FirstEnergy to partially recover its fuel-cost increases. FirstEnergy will recover fuel costs up to $75 million in 2006, $77 million in 2007, and $79 million in 2008. The recovery of costs by the fuel-recovery mechanism will be offset by a reduction in the regulatory-transition charge, so that customers' rates do not actually increase while the rate-certainty plan is in effect.

{¶ 45} If actual increased fuel costs are more than those amounts recovered through the fuel-recovery mechanism, the difference will be deferred and recovered in distribution rate cases of FirstEnergy companies for rates commencing in 2009. If actual increased fuel costs are less than the revenues generated through the fuel-recovery mechanism, the excess revenues will be applied to reduce the distribution-expense deferrals previously discussed. Increased fuel costs incurred by CEI would be deferred during the rate-certainty plan for later recovery. Fuel deferrals (and distribution deferrals) will be recovered over a 25-year period as regulatory assets in the rate base as part of future distribution rate cases of the FirstEnergy companies after the rate-certainty plan ends.

{¶ 46} WPS raises several challenges to the commission's decision to allow FirstEnergy to capitalize and defer fuel-cost increases.

{¶ 47} *R.C. 4928.02(G): Anticompetitive Subsidy.* WPS first claims that the commission authorized an unlawful and unreasonable subsidy when it allowed FirstEnergy to defer fuel-cost increases while the rate-certainty plan is in effect. WPS maintains that the commission violated R.C. 4928.02(G) when it authorized an accounting deferral that permits fuel costs intended to provide generation service to FirstEnergy's provider-of-last-resort ("POLR") customers to be charged to FirstEnergy's distribution-service customers who are not receiving POLR service.[4]

{¶ 48} R.C. 4928.02(G) provides that it is the state's policy to "[e]nsure effective competition in the provision of retail electric service by avoiding anticompetitive

---

4. POLR customers are those who return to an incumbent electric distribution utility for generation service when the customers' supplier fails to provide service. See R.C. 4928.14(C); *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 111 Ohio St.3d 300, 2006-Ohio-5789, 856 N.E.2d 213, at ¶ 24.

subsidies flowing from a noncompetitive retail electric service to a competitive retail electric service or to a product or service other than retail electric service, and vice versa."

{¶ 49} Under S.B. 3, incumbent electric-distribution utilities like the FirstEnergy companies are entitled to charge market-based retail generation rates that permit them to recover their costs of buying power at wholesale for resale to their customers. R.C. 4928.14(A). See, also, *Monongahela Power Co. v. Pub. Util. Comm.*, 104 Ohio St.3d 571, 2004-Ohio-6896, 820 N.E.2d 921, ¶ 2. In this matter, the rate-certainty plan, as approved by the commission, allows FirstEnergy to defer recovery of the increased cost of fuel used for providing generation service and later collect that cost through distribution-service base rates in future FirstEnergy distribution rate cases. If fuel-cost increases are less than the revenues collected through the fuel-recovery mechanism in each year of the rate-certainty plan, the excess revenues will be applied to reduce the distribution-expense deferrals.

{¶ 50} Generation service is a competitive retail electric service under R.C. 4928.03 and 4928.14(A), and distribution service is a noncompetitive service under R.C. 4928.15(A). R.C. 4928.02(G) prohibits public utilities from using revenues from competitive generation-service components to subsidize the cost of providing noncompetitive distribution service, or vice versa. "In short, each service component was required to stand on its own." *Migden–Ostrander v. Pub. Util. Comm.*, 102 Ohio St.3d 451, 2004-Ohio-3924, 812 N.E.2d 955, ¶ 4. Fuel is an incremental cost component of generation service. Thus, by allowing that generation-cost component to be deferred and subsequently recovered in a distribution rate case, or alternatively allowing FirstEnergy to apply generation revenues to reduce distribution expenses, the commission violated R.C. 4928.02(G).

{¶ 51} The PUCO, however, contends that there are no unlawful subsidies in this matter. The PUCO maintains that the commission's order approving the rate-certainty plan was concerned with FirstEnergy's market-based standard service offer and deferrals that could affect future distribution rates. According to the PUCO, the market-based standard service offer and distribution rates "*are firmly regulated activities* and thus cannot encompass the kind of activity that the General Assembly meant to control." (Emphasis sic.) We disagree.

{¶ 52} We stated in *Migden–Ostrander*, 102 Ohio St.3d 451, 2004-Ohio-3924, 812 N.E.2d 955, at ¶ 3–5, that S.B. 3 required the unbundling of the three major components of electric service—generation, distribution, and transmission—and the components that make up the three major service components. R.C. 4928.31(A)(1) and 4928.34(A)(1) through (7). Before generation-service competition began under S.B. 3, customers received and paid for the three major components on a bundled basis. That is, the three components were priced as

one, and electric utilities used the revenues from the bundled electric services to support their generation, distribution, and transmission expenses and investments.

{¶ 53} The unbundling of components required by S.B. 3 "ensured that an electric utility would not subsidize the competitive generation portion of its business by allocating generation expenses to the regulated distribution service provided by the utility. Conversely, it ensured that distribution service would not subsidize the generation portion of the business." *Migden–Ostrander*, at ¶ 4.

{¶ 54} The market-based standard service offer is a competitive retail generation service rate. R.C. 4928.14(A) (incumbent electric distribution utilities shall provide "a market-based standard service offer of all competitive retail electric services * * * including a firm supply of electric generation service"). In short, the PUCO overlooks that the commission's decision to allow FirstEnergy to defer recovery of fuel-cost increases authorized what S.B. 3 and R.C. 4928.02(G) prohibit—cross-subsidization between two of the three major electric-service components.

{¶ 55} The PUCO contends in the alternative that even if there was a subsidy, R.C. 4928.02(G) bans only *anticompetitive* subsidies. According to the PUCO, the commission ordered that the fuel deferrals cannot be made for an anticompetitive purpose. But the commission's statement here was made in the context of its discussion of the distribution deferrals and was not directed to the fuel-cost deferrals. In fact, the commission's order failed to directly address WPS's claim that the fuel deferrals violated R.C. 4928.02(G).

{¶ 56} The PUCO and FirstEnergy also counter that the commission acted within its broad authority under R.C. 4905.13 when it approved the fuel-cost deferrals. They maintain that the commission merely allowed FirstEnergy to defer, for accounting purposes, incremental fuel costs; that deferred expenses will be subject to ongoing scrutiny by the commission's staff; and that FirstEnergy cannot recover deferred fuel costs until the commission approves recovery in future distribution-rate cases.

{¶ 57} However, in the context of a claimed violation of R.C. 4928.02(G), the commission's order approving the rate-certainty plan was not merely an accounting order. According to the rate-certainty plan, increased fuel costs will be deferred and recovered by the FirstEnergy companies in future distribution rate cases if actual fuel costs exceed the revenues generated under the fuel-recovery mechanism. If actual fuel costs are less than those revenues generated from the fuel-recovery mechanism, those excess revenues will be applied to reduce the amounts of the distribution deferrals. In either event, the commission's approval of this provision of the rate-certainty plan violates R.C. 4928.02(G). Thus, we hold that the commission's accounting order authorizing the increased fuel-cost

deferrals was conclusive for ratemaking purposes and ripe for our consideration. See *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 111 Ohio St.3d 384, 2006-Ohio-5853, 856 N.E.2d 940, ¶ 24–25 (a party may argue that harm resulted from a PUCO accounting order that the party claims was unlawful and unreasonable).

{¶ 58} Accordingly, we hold that the commission violated R.C. 4928.02(G) when it gave FirstEnergy authority to collect deferred increased fuel costs through future distribution rate cases, or to alternatively use excess fuel-cost recovery to reduce deferred distribution-related expenses. Therefore, we reverse the commission's order on this issue and remand to the commission to modify the rate-certainty plan to remedy the statutory violation.

{¶ 59} *R.C. 4905.35(A): Undue Preference.* In proposition of law No. 1, WPS claims that the commission's accounting order authorizing the increased fuel-cost deferral violates R.C. 4905.35(A), which prohibits rates and pricing practices that give "any undue or unreasonable preference or advantage." WPS contends that charging wire service (i.e., distribution and transmission) customers in 2009 through 2033 for power costs of POLR customers in 2006 through 2009 obviously gives an unreasonable preference. In proposition of law No. 2, WPS similarly argues that shifting these costs from current to future customers results in subsidies that are specifically barred by R.C. 4905.35.

{¶ 60} In large part, WPS merely reasserts its R.C. 4928.02(G) unlawful-subsidy argument here. To the extent that WPS raises issues not resolved by our discussion of R.C. 4928.02(G) above, we find that those claims are without merit for the following reasons.

{¶ 61} First, as the commission pointed out in its order, the fact that some costs could be shifted from current ratepayers to future ratepayers does not make the increased fuel-cost deferral unlawful. This is the result whenever the commission exercises its deferral authority pursuant to R.C. 4905.13.

{¶ 62} Second, WPS's claims of undue discrimination are speculative. The final effect of the increased fuel-cost deferrals is not yet known. It is not certain that any increased fuel costs will be deferred and recovered from FirstEnergy ratepayers in future distribution rate cases. WPS can make any discrimination claims in the FirstEnergy companies' next distribution rate cases. See *Consumers' Counsel*, 63 Ohio St.3d at 524–525, 589 N.E.2d 1267 (no infirmity if ratemaking effect of accounting order can be reviewed in a subsequent rate proceeding).

{¶ 63} Third, WPS has not shown how it suffered prejudice as a result of the fuel deferrals. WPS's discrimination argument focuses primarily on the alleged harm suffered by FirstEnergy's future ratepayers and the perceived benefits to those paying rates while the rate-certainty plan is in effect. However, even if the plan discriminates among FirstEnergy ratepayers, it is not clear how any

preferences harm WPS, a retail electric-service provider in competition with FirstEnergy.

{¶ 64} Moreover, several parties representing divergent groups of ratepayers signed the stipulation on the rate-certainty plan. Those include IEU and the Ohio Energy Group (consortia of large industrial customers); the cities of Akron, Cleveland, Parma, and Toledo; Ohio Consumers' Counsel;[5] and Ohio Partners for Affordable Energy and the Neighborhood Environmental Coalition (low-income and energy-efficient customer programs). In addition, the Northeast Ohio Public Energy Council and the Northwest Ohio Aggregation Coalition (northern Ohio residential customer aggregators) pledged not to oppose it.

{¶ 65} *Cross–Subsidization Between Utilities.* WPS also raises an issue of cross-subsidization between FirstEnergy's operating companies, Ohio Edison, Toledo Edison, and CEI. The fuel-recovery mechanism provides that FirstEnergy will recover increased fuel costs of up to $75 million, $77 million, and $79 million in 2006, 2007, and 2008 respectively from Ohio Edison and Toledo Edison customers. CEI will defer its increased fuel costs for later recovery after the rate-certainty plan ends.

{¶ 66} WPS argues that it must compete against a standard service offer that includes no increased fuel costs for CEI and only a portion of increased fuel costs for Ohio Edison and Toledo Edison. However, the commission found that FirstEnergy's "price to beat or evaluation price range" that competitive retail service providers compete against should reflect the actual costs FirstEnergy incurs. The commission directed that the anticipated deferred fuel costs be included in FirstEnergy's price to beat in order to provide a level playing field for providers interested in serving FirstEnergy's service area. Moreover, as discussed later in this opinion, the rate-certainty plan also provides that shopping credits for the FirstEnergy companies will be increased to reflect increased fuel costs and the fuel deferrals booked each year of the rate-certainty plan.

{¶ 67} WPS also claims that CEI customers will pay a disproportionate share of the increased fuel costs. But in addition to being speculative, this claim is supported by no argument or evidence as to how the alleged preference prejudices WPS. Thus, this claim is without merit.

{¶ 68} *R.C. 4905.22: Unjust, Unreasonable, or Unlawful Rates.* WPS also argues in proposition of law No. 1 that R.C. 4905.22 prohibits the commission from authorizing accounting waivers that would result in unjust and unreasonable

---

5.   OCC signed only the supplemental stipulation, but by doing so, it agreed to be bound by the terms of the initial stipulation except for certain language contained in ¶ 7. OCC also urged the commission to issue an order "approving and adopting the Rate Certainty Plan as set forth in the Stipulation and this Supplemental Stipulation."

rates. In proposition of law No. 2, WPS maintains that the commission's order violates R.C. 4905.22, which WPS says bars subsidies and prohibits "the granting of discounted or favored rates to a group of customers at the expense of another."

{¶ 69} R.C. 4905.22 bars a public utility from charging unjust, unreasonable, and unlawful *rates*. As we have already mentioned, any claims about future rates are speculative because the ultimate effect of the accounting order is not known. WPS can raise its R.C. 4905.22 challenge in the FirstEnergy companies' future rate cases or in an R.C. 4905.26 complaint proceeding.

{¶ 70} In conclusion, we hold that WPS's claim that the commission violated R.C. 4928.02(G) when it authorized the increased fuel-cost deferrals is well taken. WPS's remaining claims involving violations of R.C. 4905.35 and 4905.22 are without merit. Thus, propositions of law No. 1 and No. 2 are granted in part and denied in part.

### Proposition of Law No. 3

{¶ 71} In proposition of law No. 3, WPS argues that the commission unreasonably and unlawfully failed to adjust shopping credits so that customers who bought generation service from a competitive retail electric-service provider would not subsidize the fuel costs of FirstEnergy's standard-service customers. According to WPS, retail customers of Ohio Edison and Toledo Edison who shop will get a shopping credit for the fuel-recovery mechanism but not for the increased fuel costs that are deferred for later recovery. In addition, WPS claims that CEI customers receive no shopping credits at all because they are not charged the fuel-recovery mechanism (against which a credit would be available) and their entire increased fuel costs are deferred for later payment.

{¶ 72} Shopping credits are designed to encourage customer shopping for energy supplied by a competitive retail electric-service provider. Under FirstEnergy's rate-stabilization plan, customers who switch to a competitive supplier for their generation services can avoid paying FirstEnergy's generation rate. Depending on the length of the customer's contract with a competitor, shoppers can also avoid paying a percentage of the rate-stabilization charge. See *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 109 Ohio St.3d 328, 2006-Ohio-2110, 847 N.E.2d 1184, ¶ 21–22.

{¶ 73} Contrary to WPS's argument, the rate-certainty plan provides that shopping credits will be increased to reflect not only the level of the fuel-recovery mechanism but also the fuel deferrals of Ohio Edison, Toledo Edison, and CEI. Pursuant to the stipulation approved by the commission, increased fuel costs above the amounts set forth for recovery through the fuel-recovery mechanism in each year of the rate-certainty plan are deferred and recovered in later rate cases. The stipulation provides that the applicable shopping credits for Ohio

Edison and Toledo Edison will be increased to reflect the fuel costs recovered through the fuel-recovery mechanism and also to reflect any deferred fuel costs above the amounts set in that mechanism. As to CEI, which will not recover any increased fuel costs through the fuel-recovery mechanism, the "applicable shopping credits for CEI for 2007 and 2008 will be increased to reflect the Fuel Deferrals for CEI booked during the immediately prior year."

{¶ 74} Moreover, WPS's argument that the commission's failure to adjust the shopping credits violates the policies set forth in R.C. 4928.02 is without merit. The commission's order in this case noted, "The shopping credit in the [rate-stabilization plan] is actually an avoidable expense model and under the [rate-certainty plan] the shopping credit will maintain the avoidance of all relevant expenses." [6] The commission went on to say that it would not in the context of the rate-certainty plan include the fuel-cost deferral as an avoidable expense "as it is not yet an expense being incurred by customers." In other words, the commission indicated that the fuel-cost deferrals, if and when they are charged in a distribution rate case, will be avoidable by customers who had taken service from competing power-generation providers while the rate-certainty plan is in effect.

{¶ 75} Decisions on the level of shopping incentives are within the discretion of the commission. *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 111 Ohio St.3d 300, 2006-Ohio-5789, 856 N.E.2d 213, at ¶ 61; *Constellation NewEnergy*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, at ¶ 34. Accordingly, we overrule proposition of law No. 3 because WPS has not shown that the commission abused its discretion.

### Proposition of Law No. 4

{¶ 76} WPS contends in proposition of law No. 4 that the commission unreasonably and unlawfully failed to suspend the shopping-credit caps even though shopping levels had declined below the statutory target of 20 percent.[7] WPS claims that the shopping-credit caps are a barrier to shopping and should be eliminated.

{¶ 77} The commission rejected WPS's request to suspend the caps, finding that "the matter of shopping credit class caps is not at issue in this proceeding, and that they were approved in the [rate-stabilization plan]." Indeed, we upheld FirstEnergy's shopping-credit structure in the appeal of FirstEnergy's rate-

---

6. The "avoidable expense model" referred to by the commission is a deduction against FirstEnergy's own generation charges on the bills of customers who switch to a competitive supplier for their own generation services. *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 109 Ohio St.3d 328, 2006-Ohio-2110, 847 N.E.2d 1184, ¶ 21–22.

7. See R.C. 4928.40(B)(2).

stabilization plan. *Ohio Consumers' Counsel,* 109 Ohio St.3d 328, 2006-Ohio-2110, 847 N.E.2d 1184, at ¶ 21–27.

{¶ 78} Nevertheless, WPS maintains that because the caps are hindering the development of a competitive retail market in FirstEnergy's service area, the commission erred in rejecting its request to eliminate the caps. Yet the commission also declined to eliminate FirstEnergy's shopping-credit caps in the proceedings on the rate-stabilization plan. In order to protect marketers like WPS, the commission's order approving the rate-stabilization plan provided that any approved increases in FirstEnergy's generation rates for 2006 through 2008 would also increase "the avoidable costs (i.e., shopping credits) [and] shopping credit caps." Rather than choosing to completely eliminate shopping-credit caps, the commission decided that adjusting the caps to reflect any future increases in FirstEnergy's generation rates better protected the competitive market. Again, decisions on the level of shopping incentives are within the discretion of the commission. We hold that the commission did not abuse its discretion in declining WPS's request to remove shopping-credit caps after having already considered the issue in the proceedings on the rate-stabilization plan. Therefore, we reject WPS's fourth proposition of law.

## Conclusion

{¶ 79} For the foregoing reasons, we conclude that the commission violated R.C. 4928.02(G) when it allowed FirstEnergy to collect deferred increased fuel costs through future distribution rate cases, or to alternatively use excess fuel-cost recovery to reduce deferred distribution-related expenses. In all other aspects, we affirm the orders of the commission. Accordingly, this matter is remanded for further consideration consistent with this opinion.

> Orders affirmed in part
> and reversed in part,
> and cause remanded.

MOYER, C.J., O'CONNOR, O'DONNELL, LANZINGER and CUPP, JJ., concur.

PFEIFER, J., dissents.

---

**PFEIFER, J., dissenting.**

{¶ 80} Capitalizing current expenses, particularly fuel costs, is a bad practice. Even the commission admits that it is a departure from standard policy, which requires that "ordinary expenses * * * be recovered, if at all, through annual revenues." In this case, this departure from standard policy, which is also contrary to accepted accounting practices, is not justified. There is no compelling reason to spread the expense of fuel or "vegetation management" (the trees,

shrubs, and other vegetation will undoubtedly have to be cut again) over three years, let alone 25.

{¶ 81} The majority opinion states that "[f]uel deferrals (and distribution deferrals) will be recovered over a 25-year period * * *." Although this practice may smooth out a utility's bottom line, the reality is that we are pushing expenses incurred today onto a later generation of ratepayers. It is a boon to people who leave the system, whose current rates are being subsidized by future ratepayers. And it is a travesty to think that a child born next year, who takes an apartment in 20 years, will be paying (however small an amount) for last year's higher-than-expected fuel costs.

{¶ 82} Providing rate certainty today does not justify the commission's decision to allow current costs to be deferred. I dissent.

---

Craig I. Smith, for appellant Elyria Foundry Company.

Vorys, Sater, Seymour & Pease, M. Howard Petricoff, and Stephen M. Howard, for appellant WPS Energy Services, Inc.

Marc Dann, Attorney General, Duane Luckey, Senior Deputy Attorney General, and William L. Wright, Thomas W. McNamee, and John H. Jones, Assistant Attorneys General, for appellee Public Utilities Commission of Ohio.

James W. Burk and Stephen L. Feld; Jones Day and Helen L. Liebman, for intervening appellee FirstEnergy Corp.

McNees, Wallace & Nurick, L.L.C., Samuel C. Randazzo, Lisa G. McAlister, and Daniel J. Neilsen, for intervening appellee Industrial Energy Users–Ohio.