[Cite as *In re LMD Integrated Logistic Servs., Inc. v. Pub. Util. Comm.*, 2016-Ohio-5385.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In re | : | |
| LMD Integrated<br>Logistic Services, Inc., | : | |
| | : | No. 15AP-545 |
| Appellant, | | (PUCO No. 14-685-TR-CVF) |
| | : | |
| [Public Utilities Commission of Ohio, | : | (REGULAR CALENDAR) |
| | : | |
| Appellee]. | : | |
| | : | |

D E C I S I O N

Rendered on August 16, 2016

**On brief:** *Alden Law, John L. Alden*, and *Brian L. Shaw*, for appellant. **Argued:** *John L. Alden*.

**On brief:** *Michael DeWine*, Attorney General, *William L. Wright*, and *Natalia V. Messenger*, for appellee Public Utilities Commission of Ohio. **Argued:** *Natalia V. Messenger*.

**On brief:** *Shumaker, Loop & Kendrick, LLP*, and *Michael M. Briley*, for amicus curiae Eximius Transportation Company, LLC.

APPEAL from the Public Utilities Commission of Ohio

DORRIAN, P.J.

{¶ 1} Appellant, LMD Integrated Logistic Services, Inc. ("LMD"), appeals from an order of appellee, the Public Utilities Commission of Ohio ("commission"), imposing a civil forfeiture for a violation of a hazardous material regulation. For the following reasons, we reverse the commission's decision and remand for further proceedings.

## I. Facts and Procedural History

{¶ 2} The relevant facts in this case are not in dispute. On January 8, 2014, an LMD vehicle transporting a cargo of ethylene chlorohydrin, driven by Jose Guerra, was subjected to inspection by motor carrier enforcement inspectors for the Ohio State Highway Patrol. As a result of that inspection, LMD was cited for: (1) having an inoperable ABS malfunction indicator lamp on the trailer, (2) violating 49 C.F.R. 177.817(a) because the shipping papers associated with the cargo did not include the phrase "Poison-Inhalation Hazard," and (3) violating 49 C.F.R. 177.823(a) because the required poison-inhalation hazard placards were not present on the trailer. The commission subsequently issued a notice of preliminary determination indicating that it intended to assess a civil forfeiture against LMD for the indicator lamp violation and the violation of 49 C.F.R. 177.817(a), and that it was not pursuing a forfeiture based on the placard violation. LMD requested an administrative hearing to contest the violation of 49 C.F.R. 177.817(a).

{¶ 3} The hearing was conducted on September 22, 2014 before two commission attorney examiners. The commission staff presented testimony from Ohio State Highway Patrol Motor Carrier Enforcement Inspector Timothy M. Gatesman, who performed the inspection of the vehicle and issued the citations, and Ohio State Highway Patrol Motor Carrier Enforcement Inspector Thomas L. Michael, who was acting as Inspector Gatesman's field training officer and was present during the inspection. LMD presented testimony from its Chief Executive Officer Louis Diblosi. LMD also presented affidavits and testimony from Jeffrey F. Davis, owner and proprietor of Fleet Safety Services, LLC, a motor carrier safety compliance and consulting firm, and Lawrence Dannemiller, a safety compliance consultant with Dannemiller Associates, Inc. Following the hearing, the commission issued an opinion and order finding that a violation of 49 C.F.R. 177.817(a) occurred and assessing a civil forfeiture of $1,680 against LMD for that violation. LMD filed an application for rehearing. The commission ultimately issued an entry denying LMD's application for rehearing, finding that LMD's claims of error with response to the initial opinion lacked merit.

## II. Assignments of Error

{¶ 4}   Appellant appeals from the commission's order, assigning three errors for this court's review:

> [I.] The Commission erred in failing to find that the Commission's enforcement personnel should have administered a test and made a factual determination pursuant to Title 49, Section 171.2(f) of the Code of Federal Regulations ("CFR") and that the Commission's enforcement personnel had failed to do so.
>
> [II.] The Commission erred in its finding that the Commission itself even considered 49 CFR §171.2(f), let alone analyzed the regulatory history interpretive case law, and interpretive regulatory rulings related to 49 CFR §171.2(f), in making its conclusions of law.
>
> [III.] The Commission erred in unlawfully exceeding the scope of 49 CFR §171.2(f) by creating its own legal standard of liability assignable to Appellant as a motor carrier with respect to 49 CFR §177.817.

## III.  Discussion

### A. Standard of Review

{¶ 5}   This court has exclusive original jurisdiction to review, modify, or vacate an order of the commission under the same standards the Supreme Court of Ohio applies when determining appeals under Chapter 4903 of the Ohio Revised Code.  R.C. 4923.99(C). " 'R.C. 4903.13 provides that a [commission] order shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable.' "  *Ohio Consumers Counsel v. Pub. Util. Comm.*, 111 Ohio St.3d 300, 2006-Ohio-5789, ¶ 12, quoting *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, ¶ 50.  *See also* R.C. 4923.99(D) ("An order issued by the commission to secure compliance with Chapter 4921. or 4923. of the Revised Code or an order issued under division (A)(1) of this section assessing a forfeiture shall be reversed, vacated, or modified on appeal if, upon consideration of the record, the court is of the opinion that the order was unlawful or unreasonable.").  With respect to questions of fact, a reviewing court will not reverse or modify a commission decision "when the record contains sufficient probative evidence to show that the commission's

decision was not manifestly against the weight of the evidence and was not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty." *Elyria Foundry Co. v. Pub. Util. Comm.*, 114 Ohio St.3d 305, 2007-Ohio-4164, ¶ 13.  With respect to questions of law, however, we exercise a de novo review. *Cleveland Elec. Illuminating Co. v. Pub. Util. Comm.*, 76 Ohio St.3d 163 (1996); *In re OPC Polymers v. Pub. Util. Comm.*, 10th Dist. No. 12AP-735, 2013-Ohio-5443, ¶ 7.  This court has previously noted that in conducting a de novo review on a question of law, we apply due deference to the commission's expertise in its own field of regulation.  *Id.*

### B. LMD's Second and Third Assignments of Error

{¶ 6}  We begin with LMD's second and third assignments of error, which are interrelated. LMD's second assignment of error asserts the commission erred by finding in its entry on rehearing that it had considered 49 C.F.R. 171.2(f) in reaching its conclusions of law.  LMD's third assignment of error asserts the commission exceeded its authority and failed to properly apply 49 C.F.R. 171.2(f).  In effect, LMD's second and third assignments of error assert that the commission improperly applied the federal regulations governing the transportation of hazardous materials that have been incorporated into Ohio law.

### 1. <u>Regulations governing transport of hazardous materials</u>

{¶ 7}  The commission is authorized by statute to adopt rules applicable to highway transportation of hazardous materials by motor carriers operating in interstate or intrastate commerce. R.C. 4923.04(A)(2).  Pursuant to that authority, the commission has adopted certain provisions of the Code of Federal Regulations ("CFR") that are applicable to transportation of hazardous materials by motor vehicle, including Parts 171, 172, and 177 of the CFR.  Ohio Adm.Code 4901:2-5-03(A).  The federal regulations provide that a person may not transport hazardous material by highway unless that person has received a shipping paper prepared in accordance with Part 172 of the CFR. 49 C.F.R. 177.817(a).  As relevant to this appeal, the regulations provide that when materials that are poisonous by inhalation are being transported, the words "Poison-Inhalation Hazard" or "Toxic-Inhalation Hazard" must appear on the shipping paper immediately following the shipping description.  49 C.F.R. 172.203(m).  Under the CFR, ethylene chlorohydrin is classified as poisonous by inhalation. 49 C.F.R. 172.101; 172.102(c)(1).

{¶ 8}   The shipping paper associated with the shipment of ethylene chlorohydrin did not indicate that the cargo was a poison-inhalation hazard.  The parties do not dispute that the shipping paper lacked this notice; rather, the question is whether LMD violated 49 C.F.R. 177.817(a) by transporting hazardous material with a shipping paper that did not comply with hazardous material regulations.[1]  LMD argues that it should not have been cited for violating 49 C.F.R. 177.817(a) because the shipping paper was prepared by a prior carrier and LMD did not have actual or constructive knowledge that the shipping paper was incorrect.  LMD cites 49 C.F.R. 171.2(f), which provides, in relevant part, that "[e]ach carrier who transports a hazardous material in commerce may rely on information provided by the offeror of the hazardous material or a prior carrier, unless the carrier knows or, a reasonable person, acting in the circumstances and exercising reasonable care, would have knowledge that the information provided by the offeror or prior carrier is incorrect."  LMD argues that, to the extent the commission considered 49 C.F.R. 171.2(f) in making its decision, it erred by concluding that LMD had a duty to verify that the shipping paper was correct.  LMD also asserts that the commission's decision is inconsistent with the interpretation of 49 C.F.R. 171.2(f) by federal authorities.

### 2. Federal interpretation of hazardous materials regulations

{¶ 9}   Under federal law, a civil penalty may be imposed when an individual knowingly violates the hazardous materials regulations. 49 U.S.C. 5123(a).  *See also* 63 Fed.Reg. 30411, 30412 (formal interpretation of hazardous materials regulations).  The civil penalty statute provides that a person acts knowingly when he has actual knowledge of the facts giving rise to the violation or a reasonable person acting in the circumstances and exercising reasonable care would have knowledge of the facts giving rise to the violation. 49 U.S.C. 5123(a).  The United States Department of Transportation has interpreted this to mean that "a carrier may not ignore readily apparent facts that indicate that either (1) a shipment declared to contain a hazardous material is not properly

---

[1] As described herein, as part of the inspection, Guerra provided the inspectors with multiple documents, including a shipping paper prepared by Panalpina, Inc., and a shipping or invoice document prepared by LMD. In the proceedings before the commission, the inspectors referred to the document prepared by LMD as a shipping paper. LMD disputed this characterization and asserted that it was a billing or invoice document. The commission does not appear to have expressly reached a finding as to whether the LMD document was a shipping paper. Whether the LMD prepared document is characterized as a shipping paper or an invoice, it is undisputed that neither the Panalpina shipping paper nor the LMD document contained an indication that the cargo was a poison-inhalation hazard.

packaged, marked, labeled, placarded, or described on a shipping paper, or (2) a shipment actually contains a hazardous material governed by the [hazardous materials regulations] despite the fact that it is not marked, labeled, placarded, or described on a shipping paper as containing a hazardous material."  63 Fed.Reg. 30411, 30412.

{¶ 10} In 2005, 49 C.F.R. 171.2(f) was amended to include the provision cited by LMD, specifying that a carrier transporting hazardous materials can rely on information provided by the offeror of the hazardous materials or a prior carrier unless the carrier has actual or constructive knowledge that the information provided by the offeror or prior carrier is incorrect.  As part of promulgating that amendment to the regulations, the Department of Transportation explained that "when a carrier accepts and transports a shipment of hazardous material that is not properly prepared for transportation in commerce, with actual or constructive knowledge of the noncompliance, the carrier's liability is based on its own improper acceptance and transportation of that shipment— not the violation of the person who improperly prepared the shipment."  70 Fed.Reg. 43638, 43640.  The Department of Transportation has reiterated this standard of actual or constructive knowledge in interpretation letters related to the hazardous materials regulations.  *See* Department of Transportation, Pipeline & Hazardous Materials Safety Administration Interpretive Letter No. 08-0301R (Dec. 11, 2009) ("A carrier may rely on the original shipper's certification unless the carrier knows or, a reasonable person, acting in the circumstances and exercising reasonable care, would have knowledge that the certification provided by the offeror (shipper) is incorrect.  However, a carrier who knowingly uses incorrect information (see § 171.2(e) and (f)), or a person who knowingly or willfully provides incorrect information, is in violation of the [hazardous materials regulations]."); Department of Transportation, Pipeline & Hazardous Materials Safety Administration Interpretive Letter No. 13-0195 (Dec. 23, 2013) ("Unless the carrier has actual or constructive knowledge that the packages are not properly secured, we see no reason not to accept the shipment.  However, the carrier may not ignore readily apparent information that would indicate the packages are not properly secured.").

{¶ 11} The Federal Motor Carrier Safety Administration recently considered a case similar to the present appeal in *In re Transervicios, SA de CV*, Docket No. FMCSA-2010-0043 (Mar. 23, 2015).  In that case, a truck containing a sealed shipment was inspected

because the truck trailer had a cracked rear wheel. The inspector directed the driver to break the seal on the trailer so that he could inspect the cargo and discovered that the cargo included Class 9 air bag inflators and cylinders containing compressed hydrogen gas, both of which were classified as hazardous materials. However, the shipping paper provided by the driver indicated that the truck was only transporting air bag inflators. The carrier was charged with violating 49 C.F.R. 177.817(a) for transporting hazardous materials with an incorrect shipping paper because the shipping paper did not list the flammable compressed hydrogen gas cylinders.

{¶ 12} At a hearing before an administrative law judge, a witness for the enforcement agency testified that the carrier should have known that the shipment could have contained hazardous materials that were not declared on the shipping paper because: (1) the regulatory definition of air bag inflators stated that they sometimes included cylinders of gases, (2) the carrier was aware that the shipper sometimes transported hydrogen cylinders for air bag modules because the carrier had been transporting air bags for that shipper since 1997 and previous inspections had disclosed the presence of hydrogen cylinders in air bag shipments, and (3) an enforcement case had been brought against the carrier in 2007 for the same violation involving an air bag shipment from the same shipping company. A witness for the carrier testified that the company had transported air bag inflators for this shipping company over 3,000 times and that there were only two instances in which the trailers were discovered to also contain other materials. He also testified that there was nothing on the shipping manifest that would have given the carrier's employees notice that the shipment contained anything other than air bag inflators. The administrative law judge concluded that there was no evidence the carrier had actual knowledge that the shipping paper was incorrect. While acknowledging the prior alleged violation might raise awareness of a possible discrepancy, the administrative law judge concluded that in the normal course of business the carrier was permitted to rely on the shipper's representations on the shipping paper and that, because this was an unremarkable load from a regular customer, there was no evidence suggesting that this shipment was not in the normal course of business.

{¶ 13} On administrative appeal, the administrator affirmed the administrative law judge's decision, concluding that, under the circumstances of the case, no factors

warranted further inquiry by the carrier regarding the accuracy of the shipping paper. The administrator noted that the inspector who issued the citation did not suspect that the shipping paper was incorrect and only discovered the violation after requesting that the sealed trailer be opened. The inspector admitted there was nothing to put the driver on notice that there were two types of inflators contained in the shipment. The administrator concluded that, based on the evidence, there was nothing suspicious about the package and nothing to put the driver on notice that further inquiry was needed.

### 3. Commission's application of regulations in this case

{¶ 14} In the present case, Inspector Gatesman testified that, as part of the inspection, Guerra provided multiple documents, including a shipping paper prepared by Panalpina, Inc., a shipping or invoice document prepared by LMD, and a material safety data sheet ("MSDS") document. The MSDS document was a 7-page document prepared by BASF, the original shipper, composed of 16 sections with information about ethylene chlorohydrine, including sections titled "hazard identification," "first-aid measures," "fire-fighting measures," "accidental release measures," "exposure controls and personal protection," and "transport information."

{¶ 15} Inspector Gatesman testified that he conducted a walk around inspection of the truck and did not ask the driver to open the trailer because he felt pressure on the door of the cargo container. He examined the shipping paper, which indicated that the cargo was ethylene chlorohydrin and that it was classified as a "Packing Group I" substance. Inspector Gatesman classified Packing Group I substances as the worst or most severe chemicals. Inspector Gatesman testified that he determined the substance to be a poison-inhalation hazard by reviewing the codes and tables contained in his hazardous materials manual, which included the relevant C.F.R. provisions. He testified that it took "probably less than five minutes" using these materials to determine that the substance was a poison-inhalation hazard. (Tr. at 30.) Inspector Gatesman further stated that the "hazard identification" portion of the MSDS document identified the substance as harmful if inhaled, but admitted on cross-examination that there was no indication of an inhalation hazard on the "transport information" portion of the MSDS document.

{¶ 16} Inspector Michael also testified at the hearing indicating that he was acting as a field training officer for Inspector Gatesman on January 8, 2014 and accompanied

him during the inspection of the LMD truck. Inspector Michael testified that, prior to becoming a motor carrier enforcement inspector, he worked as a truck driver for 27 years and that his work included hauling hazardous materials. He testified as to the steps he would have taken in dealing with a Packing Group I material when he was a driver to ensure the correct markings and placards were present on the vehicle. Inspector Michael testified that, with respect to the Panalpina shipping paper, "[t]he fact that it has a Packing Group I [notation] would make me inquire more as to the information about this product." (Tr. at 86.) He testified that during the inspection process he contacted his supervisor to verify that the poison-inhalation notice was required to be included on the shipping paper.

{¶ 17} LMD presented testimony from Chief Executive Officer Diblosi. Diblosi testified regarding LMD's safety ratings and the hazardous materials training required for LMD drivers. Diblosi testified that, with respect to the MSDS documents that accompanied shipments, LMD drivers were trained to refer only to the "transportation information" section. LMD also presented an affidavit and testimony from Davis, owner and proprietor of Fleet Safety Services, LLC. Davis opined that the error in the shipping paper originated with the original shipper, BASF, and continued throughout other documents prepared by subsequent carriers, including Panalpina. Davis further opined that LMD and its driver, Guerra, acted reasonably under the circumstances in relying on the shipping information provided by Panalpina and prior carriers of the cargo. LMD also presented an affidavit and testimony from Dannemiller, a safety compliance consultant with Dannemiller Associates, Inc. Dannemiller testified that it was his opinion that there was nothing on the shipping paper that would have given the driver a reason to suspect it was incorrect, and that, under the reasonable care standard, the driver would not have discovered any problem with the shipping paper.

{¶ 18} There was no evidence that LMD had actual knowledge that the Panalpina shipping paper was incorrect. LMD argues that the commission was therefore required to determine whether "a reasonable person, acting in the circumstances and exercising reasonable care, would have knowledge that the information provided by" Panalpina, as the prior carrier, was incorrect. 49 C.F.R. 171.2(f).

{¶ 19} Although the commission cited 49 C.F.R. 171.2(f) in its initial opinion and entry on rehearing, we conclude that the commission did not appropriately interpret and apply the rule. Despite there being specific evidence about the nature of this particular shipment and the documents associated with it, the commission did not cite any readily apparent facts or other circumstances that would have caused a reasonable person exercising reasonable care to have known that the shipping paper was incorrect or that further inquiry was needed. Instead, the commission effectively decided that carriers are always required to verify that shipping papers are accurate and properly labeled. In the initial opinion, the commission expressly stated:

> In reaching its conclusion, the Commission considered and balanced the associated risks to the community at large that could result from improperly labeled shipments of hazardous materials against the burden placed on the carriers to take the time to check shipment contents for appropriate warnings. In the end, the risks outweigh the burdens. * * * While it may take carriers some additional time to double-check their loads, it is very reasonable to expect them to do their due diligence and ensure all proper warnings are in place. As the maxim goes, it is better to be safe than sorry.

(Opinion and Order at 5-6.) In its entry on rehearing, the commission reiterated this conclusion:

> In the Order, the Commission made a determination about what constitutes reasonable care, stating "it is very reasonable to expect (carriers) to do their due diligence and ensure all proper warnings are in place."
>
> * * *
>
> The Commission does not believe it is unreasonable to expect carriers to exhibit a minimal amount of review in order to ensure the proper safety measures are being made in the transportation of hazardous materials.

(Entry on Rehearing at 2-3.) By concluding that reasonable care requires carriers to verify the accuracy of shipping papers when transporting hazardous materials, the commission's decision effectively eliminates the portion of 49 C.F.R. 171.2(f) permitting a carrier to rely on information provided by the offeror or a prior carrier. This result is inconsistent with

the plain language of the rule and the application of the rule by relevant federal authorities.  Therefore, we conclude that the commission's decision is unreasonable.

{¶ 20}  Accordingly, we sustain LMD's second and third assignments of error.

### C. LMD's First Assignment of Error

{¶ 21}  In its first assignment of error, LMD asserts the commission erred by failing to find that the enforcement personnel who issued the citation were required to make a factual determination pursuant to 49 C.F.R. 171.2(f).  LMD appears to argue that, prior to issuing a citation related to information provided by the offeror of the hazardous material or a prior carrier, inspection officials must determine whether a carrier had actual or constructive knowledge that information provided by the offeror of the hazardous material or a prior carrier was incorrect.  Because we find in this case the commission failed to apply the appropriate legal standard in determining whether LMD had constructive knowledge that the shipping paper was incorrect, we need not reach the question of whether the commission erred by failing to find that inspectors are required to make such a determination prior to issuing a citation.  Accordingly, we render LMD's first assignment of error moot.

## IV.  Conclusion

{¶ 22}  As noted above, we review commission decisions under the same standards as the Supreme Court of Ohio hears and determines appeals under Chapter 4903 of the Ohio Revised Code.  R.C. 4923.99(C).  Having determined that the commission's decision was based on an unreasonable interpretation of regulatory provisions, pursuant to our statutory authority, we reverse and remand the decision.  *See, e.g., Green Cove Resort I Owners' Assn. v. Pub. Util. Comm.*, 103 Ohio St.3d 125, 2004-Ohio-4774, ¶ 30 (reversing and remanding with instructions); *Tongren v. Pub. Util. Comm.*, 85 Ohio St.3d 87, 93 (1999) (reversing and remanding for development of a record and correction of errors); *Consol. Rail Corp. v. Pub. Util. Comm.*, 47 Ohio St.3d 81, 85 (1989) (reversing and remanding for rehearing); *Dayton Power & Light Co. v. Pub. Util. Comm.*, 4 Ohio St.3d 91, 106 (1983) (reversing and remanding for further proceedings).  Accordingly, we sustain LMD's second and third assignments of error and render moot its first assignment of error.  The commission's decision is reversed and this matter is remanded to the Public

Utilities Commission of Ohio for further proceedings in accordance with law and consistent with this decision.

*Judgment reversed and*
*cause remanded.*

KLATT and BRUNNER, JJ., concur.

————————